STATE OF CONNECTICUT *v.* RAYMOND MCRAE
(AC 29208)

DiPentima, Lavine and Peters, Js.

Argued September 22—officially released December 8, 2009

*Joseph M. Merly*, with whom, on the brief, was *John R. Williams*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *David J. Smith*, assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Raymond McRae, appeals from the judgment of conviction, rendered after a jury trial, of assault in the second degree in violation

of General Statutes § 53a-60 (a) (1).[1] On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction and (2) the court improperly restricted his counsel's closing argument to the jury. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 2, 2002, at approximately 10 p.m., two inmates, the defendant and Anthony Gianelli, engaged in a verbal altercation at the Corrigan-Radgowski Correctional Institution (Corrigan). The incident turned physical, and the two men violently punched each other. At one point, the defendant picked up Gianelli and threw him to the ground. The fight continued and correctional officers, responsible for the safety of the inmates, attempted to stop the fracas. The victim, correctional officer Alexander Muzykoski, placed himself between the defendant and Gianelli and attempted to grasp the defendant. The defendant, still fighting with Gianelli, struck the victim in his nose, causing a nasal fracture. The victim recovered sufficiently to restrain the defendant, who was then escorted to medical and restrictive housing.[2]

Following a trial, the jury found the defendant guilty of assault in the second degree. The court sentenced him to five years incarceration, suspended after nine months, followed by five years probation. This appeal followed. Additional facts will be set forth as needed.

I

The defendant first claims that the evidence was insufficient to sustain his conviction of assault in the

---

[1] The state also charged the defendant with failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). The jury returned a verdict of not guilty with respect to this charge.

[2] The jury heard testimony describing the restrictive housing unit as a "jail within [a] jail."

second degree. Specifically, he argues that there was no evidence that he had intended to strike Gianelli, and, therefore, there was no intent that could be transferred to the victim.[3] We are not persuaded by the defendant's claim.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable

---

[3] See *State* v. *Kemler*, 106 Conn. App. 359, 365, 942 A.2d 480 (application of transferred intent doctrine in context of assault in the second degree charge), cert. denied, 286 Conn. 920, 949 A.2d 482 (2008); see also General Statutes § 53a-60 (a) ("[a] person is guilty of assault in the second degree when: [1] With intent to cause serious physical injury to another person, *he causes such injury* to such person or *to a third person* . . . ." [emphasis added]).

doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty. . . . Furthermore, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Bivrell,* 116 Conn. App. 556, 559–60, 976 A.2d 60 (2009); see also *State* v. *Michael H.,* 291 Conn. 754, 759, 970 A.2d 113 (2009).

In the present case, the state was required to prove, beyond a reasonable doubt, that the defendant, with the intent to cause serious physical injury to Gianelli, caused such injury to the victim, a third person. See General Statutes § 53a-60 (a) (1). "It is well settled . . . that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Sam,* 98 Conn. App. 13, 35–36, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006); *State* v. *Andrews,*

114 Conn. App. 738, 744–45, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009). Intent may be inferred from circumstantial evidence such as the events leading to and immediately following the incident, and the jury may infer that the defendant intended the natural consequences of his actions. *State* v. *Saez*, 115 Conn. App. 295, 303, 972 A.2d 277, cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009).

The jury heard testimony from correctional officers Victor Irizarry and Michael Perrino that the defendant and Gianelli had been punching each other in a violent manner. The defendant picked up Gianelli and threw him on the ground, and the altercation continued. The defendant threw a punch with enough force to fracture the victim's nose and cause it to bleed "everywhere." As a result of his injury, the victim required surgery and was unable to work for two months. Given these facts, the jury was free to conclude that the defendant had intended to strike Gianelli and that this intent was transferred to the actual recipient of the blow, the victim. Mindful of our standard of review, we conclude that there was sufficient evidence for the jury to conclude that the defendant possessed the requisite intent to support his conviction of assault in the second degree.

## II

The defendant next claims that the court improperly restricted his counsel's closing argument to the jury. Specifically, he argues that the court improperly prevented argument regarding the defendant's theory that the victim had been injured in a fall unrelated to the defendant's actions and that the absence of a certain videotape supported this theory. We are not persuaded.

The following additional facts are necessary for our discussion. On April 3, 2006, the defendant filed an "Emergency Motion to Dismiss." The motion alleged

that the state had lost or destroyed potentially exculpatory evidence in violation of the defendant's right to due process pursuant to article first, § 8, of our state constitution. The court denied the defendant's motion on April 6, 2006.

Mike Lajoie, the warden at Corrigan, had testified in connection with the defendant's motion to dismiss, and his testimony subsequently was read to the jury. Lajoie described the various video recording systems in place at Corrigan in 2002. He first detailed the "aurora" system, where the images from six cameras were recorded continuously onto a videocassette tape. Due to the ratio of cameras to tapes, a three second delay was necessary. Additionally, the aurora system required a significant number of tapes, as there were sixteen videocassette recorders. Every twenty-four hours, the tapes would be replaced and stored for thirty days. If an incident, such as a physical altercation, had been recorded, the tape would be preserved for evidence. A member of the correctional staff, usually a captain or major, would review the tapes to determine whether they should be preserved or recycled.[4]

A second recording system activated when a correctional officer called a "code blue" to alert others of an incident. At the control center, an officer would push a "record button," and real time video recording would commence. Lajoie stated that this second recording system might not capture the initial part of an incident but would certainly record the aftermath. A third system, a handheld recording, also occurred in real time. When a code blue was called, one officer was responsible for bringing a handheld video camera to the site of the incident and recording it until the inmate had received either medical treatment or had been secured.

---

[4] Lajoie further testified that the videocassettes were recycled for the purpose of cost savings.

Following the incident involving the defendant on May 2, 2002, two recordings, the code blue and the handheld, were introduced into evidence. No aurora recording had been preserved. The report regarding the altercation involving the defendant did not mention whether the aurora tape had captured the defendant's actions with respect to the victim. On cross-examination by the prosecutor, Lajoie testified that he was not present at the prison on the date of the incident, that he did not know whether the aurora system had been working on May 2, 2002, and that the aurora system did not record every angle of every incident that occurred in the prison.

During the charging conference, the court stated that it would not provide a missing evidence instruction.[5] It then reminded counsel that closing argument must have some basis in the evidence adduced during the trial and cautioned that the court did not want to stop counsel's presentation to the jury. It then stated that there was no evidence to support the defendant's contention that the victim "broke his nose by falling on the floor in the course of separating [the defendant] and . . . Gianelli . . . ." After discussion of other matters, the court then inquired whether defense counsel intended to discuss Lajoie's testimony during closing argument. Counsel responded in the affirmative. The court then stated: "There is going to be—then, that—because of the fact that this has been a major dispute, and I have told you several times that—that I do not believe it is correct to let the jury infer that something nefarious occurred. I will do an instruction regarding that, the aurora system, and what I wrote is . . . [the jury] heard and will

---

[5] The court indicated: "[The aurora videocassette recording] is not considered missing evidence. It is whatever it was, we do not know what it was, we never will know what it was, if it was anything. It is not considered missing evidence. I will not do a missing evidence instruction, and your—your objection is noted."

see portions of [Lajoie's] testimony at a prior hearing in this matter. You heard about something called an aurora system. This system may or may not have been working on the night of this alleged incident. If it was working, it may or may not have shown something relevant to this case. You are not to draw any inference regarding this aurora system. It is speculative only and could have, if it existed, been favorable to either side in this incident."[6] The defendant objected on the ground that his sixth amendment right to present a defense was violated and that the court had prevented counsel from arguing to the jury that the victim's injury was caused by a fall unrelated to the actions of the defendant. During closing argument, defense counsel mentioned the aurora tape.[7]

At the outset, we note that the defendant does not challenge the court's decision to deny his motion to dismiss on the basis of lost or destroyed exculpatory evidence,[8] nor does he claim that the court improperly prevented the jury from hearing certain evidence regarding the aurora system. Finally, he does not argue that the court improperly failed to provide the jury with a missing evidence instruction. Instead, he has limited

---

[6] The court subsequently provided this instruction to the jury.

[7] Specifically, defense counsel made the following statement to the jury: "Now, in addition to there not being any corroboration from any of the witnesses who came in here, there is also no corroboration from the tape. You saw what happened with your own eyes. Now, they want you to believe that this mysterious punch happened somewhere off camera or before this camera started. But where are the aurora tapes? You heard from the transcript of . . . Lajoie's testimony that the prison has three methods—their general policy is that they have three methods—methods for taping. Now, the state provided two tapes, and they say that this punch happened sometime before the second tape started. Now, this aurora system, as you heard from the testimony, is continuous and is taping twenty-four hours. I am not saying that anything nefarious happened, but all I am asking is, where is the aurora tape? Where is the tape that was recording twenty-four hours? Ladies and gentlemen, this is reasonable doubt."

[8] See generally *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995).

his claim on appeal to whether the court deprived him of his sixth amendment right to counsel by limiting his attorney's summation to the jury.[9]

"[T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations." (Internal quotation marks omitted.) *State* v. *Guzman*, 110 Conn. App. 263, 273–74, 955 A.2d 72 (2008), cert. denied, 290 Conn. 915, 965 A.2d 555 (2009); see also *State* v. *Arline*, 223 Conn. 52, 59, 612 A.2d 755 (1992). Nevertheless, "[w]hile we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Internal quotation marks omitted.) *State* v. *Cruz*, 71 Conn. App. 190, 211, 800 A.2d 1243, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

In the present case, there was no evidence that the aurora recording would have captured the physical

---

[9] We are mindful of our Supreme Court's recognition that "[t]he right to the assistance of counsel ensures an opportunity to participate fully and fairly in the adversary factfinding process. . . . The opportunity for the defense to make a closing argument in a criminal trial has been held to be a basic element of the adversary process and, therefore, constitutionally protected under the sixth and fourteenth amendments. . . . Closing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case. Only then can [counsel] . . . argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions. And for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 305, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

altercation involving the defendant and the victim. Lajoie was not at Corrigan on the date of the physical altercation. He indicated that blind spots existed in the system, but he was not asked to identify the precise location of those blind spots. Additionally, Lajoie stated that not every incident within the prison was recorded by the aurora system. He also testified that even if an incident had been recorded, the aurora system would not necessarily have recorded every angle or aspect of the physical fight. Last, there was no testimony that the aurora system had been operational on the night of the incident. The court properly concluded that defense counsel invited the jury to engage in pure speculation and consider matters not in evidence. Accordingly, we conclude that the court did not abuse its discretion in precluding argument regarding the claim that the victim was injured in a fall unrelated to the defendant's actions.

The judgment is affirmed.

In this opinion the other judges concurred.