## STATE OF CONNECTICUT *v.* JOHN PAPANDREA
## (AC 29768)

Bishop, Alvord and Dupont, Js.

Argued October 16, 2009—officially released March 30, 2010

*Moira L. Buckley*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, John Papandrea, appeals from the judgment of conviction, rendered after a jury trial, of nine counts of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2).[1] On appeal, the defendant claims that (1) the evidence adduced at trial was insufficient to support his conviction, (2) the court's jury instruction to use the information as a "road map" deprived him of the right to have the state prove each element of the offenses charged beyond a reasonable doubt[2] and (3) he was deprived of his right to due process as a result of prosecutorial impropriety. We affirm the judgment of the trial court.

The state claimed that the defendant, a corporate financial officer, an accountant and employee of Homecare Management Strategies, Inc. (Homecare), took corporate funds for personal use in order to purchase artwork for himself, without right, authority or permission. The defendant did not contest many of the basic facts introduced by the state but asserted, as his defense, that he lacked the requisite wrongful intent for conviction of larceny in the first degree.

The jury reasonably could have found the following facts. Donna Galluzzo owns and operates Homecare.

---

[1] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds ten thousand dollars . . . . "

[2] The defendant does not claim that the court's instructions as to the elements of the crime were erroneous or insufficient in any way, except as discussed in part II of this opinion.

Homecare provides financial services to home health care agencies, including accounting, billing and collection. In 1991, the defendant began to work as an accountant for Omni Home Health Services (Omni), a company owned by Galluzzo. In 1996, the defendant began to work for Homecare as a junior accountant. Many of Homecare's employees, including the defendant, performed services for White Oak Systems, LLC (White Oak). White Oak is a software development company. White Oak built a software system for Omni and also provided "information systems" to Homecare. The offices for White Oak and Homecare were located in the same building and on the same floor.

In 1999, Masonicare, a health care provider, bought Omni and entered into a contract with Homecare for financial support services. Under the terms of the contract, Masonicare paid Homecare a prescribed fee, a portion of which Homecare was obligated to pay to White Oak for software development. At about the same time that the contract was executed, Carl Caslowitz, the original owner of White Oak, transferred 85 percent of White Oak stock to the defendant, at the request of Gianfranco Galluzzo, Donna Galluzzo's husband. The stock was transferred to the defendant without any consideration for the purpose of "corporate convenience."[3] At the time, Homecare and White Oak had an oral agreement that provided that Homecare pay White Oak's salary obligations and its direct cost of doing business. White Oak reimbursed Homecare for those costs and for services provided by Homecare employees to White Oak. Pursuant to the oral agreement, the financial obligations imposed on the two companies were tracked using "due to/due from" accounting measures.

---

[3] Nothing in the transcripts reveals a definition of "corporate convenience."

In 2002, Homecare had two in-house finance employees, the defendant and Cynthia O'Sullivan. In September, 2003, O'Sullivan left the employ of Homecare, at which time the defendant was Homecare's sole authorized check signatory. In early 2004, with the end of the Masonicare contract approaching, Donna Galluzzo requested that the defendant provide Homecare's full financial record in order to review the financial status of the company. The defendant was not forthcoming with the financial records. At the end of 2004, the defendant informed Donna Galluzzo that a meeting was necessary to settle the "due to/due from" arrangement between Homecare and White Oak. On March 30, 2005, the defendant, without consideration, transferred his 85 percent of White Oak's stock back to Caslowitz. On April 1, 2005, the defendant met with Donna Galluzzo, Gianfranco Galluzzo and Caslowitz. Gianfranco Galluzzo requested the "due to/due from" information, which the defendant refused to provide. The defendant informed Donna Galluzzo and Gianfranco Galluzzo that he had transferred his stock in White Oak back to Caslowitz, which caused Gianfranco Galluzzo to become visibly angry. The defendant's employment with Homecare was then terminated.

Homecare hired Mahoney Sabol & Company, LLP, to conduct an audit of Homecare's finances. The audit revealed that the defendant had issued a number of checks, drawn on Homecare's accounts payable, to various art dealers. The checks had been issued between February 25, 2004, and February 11, 2005. Donna Galluzzo previously did not know that the defendant was purchasing artwork for his personal use with Homecare funds. The defendant never requested permission to purchase the artwork, nor was he authorized by Homecare to make such purchases. Although the defendant claimed that Homecare owed him money, he never filed a claim to collect the moneys that Homecare allegedly

owed to him and never requested that moneys that had not been transferred already be transferred from Homecare to White Oak. The defendant admitted that he had issued the Homecare checks in question and that he had purchased the artwork for his personal use. His defense at trial was that Homecare owed him money as White Oak's principal shareholder at the time he had issued the checks.

Following a jury trial, the defendant was convicted of nine counts of larceny in the first degree. The court sentenced the defendant to a total effective term of twelve years incarceration, suspended after six years, and five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim is that the evidence adduced at trial was insufficient to support his conviction of larceny in the first degree. Specifically, he argues that the state presented insufficient evidence on the element of intent. We disagree.

To resolve the defendant's claim, we begin by setting forth the relevant legal principles and the standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Saez*, 115 Conn. App. 295, 300–301, 972 A.2d 277, cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009).

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive

another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." Section 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds ten thousand dollars . . . ."

The defendant does not contest that he appropriated the moneys at issue for his personal benefit. The issue is whether the state proved beyond a reasonable doubt the element of intent to deprive another of property.

"It is well settled . . . that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Citation omitted; internal quotation marks omitted.) *State* v. *Sam*, 98 Conn. App. 13, 35–36, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006). "Intent may be inferred from circumstantial evidence such as the events leading to and immediately following the incident, and the jury may infer that the defendant intended the natural consequences of his actions." *State* v. *McRae*, 118 Conn. App. 315, 320, 983 A.2d 286 (2009). "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. A specific intent to deprive another of property or to appropriate the same to himself . . . is an essential

element of larceny . . . and as such must be proved beyond a reasonable doubt by the state. . . .

"The animus furandi, or intent to steal, is an essential element of the crime of larceny at common law. . . . Since the taking must be with felonious intent . . . taking under a bona fide claim of right, however unfounded, is not larceny. . . . [A]lthough ignorance of the law is, as a rule, no excuse, it is an excuse if it negatives the existence of a specific intent. Therefore, even if the taker's claim of right is based upon ignorance or mistake of law, it is sufficient to negative a felonious intent. A fortiori, a mistake of fact, if it is the basis of a bona fide claim of right, is sufficient. . . .

"One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in such case the felonious intent is lacking. . . . The general rule applies . . . to one who takes it with the honest belief that he has the right to do so under a contract . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Varszegi*, 33 Conn. App. 368, 372–73, 635 A.2d 816 (1993), cert. denied, 228 Conn. 921, 636 A.2d 851 (1994).

The following additional facts are relevant for our resolution of the defendant's claim. As the accountant and chief financial officer of Homecare, the defendant was responsible for keeping all records and books for the company. The defendant also was responsible for the preparing and maintaining of the financial records for White Oak, functioning as White Oak's chief financial officer. Both Donna Galluzzo and Gianfranco Galluzzo requested, at different times, the financial records for Homecare from the defendant. The defendant

refused to provide the financial records. A general ledger was used to keep track of Homecare's debt, including Homecare's debt to White Oak.[4] Homecare's general ledger recorded accruals and offsets for various services performed between Homecare and White Oak. A transfer was made each month by Homecare to White Oak for salaries and expenses. For each purchase of artwork, the defendant indicated in the ledger the person to whom the money was paid for the artwork and recorded it in a manner that reduced Homecare's debt to White Oak. In the ledger, the defendant reduced Homecare's debt to White Oak by the amount of each check he wrote to the art vendors. In addition, the check requests to Homecare for the art vendors referenced Homecare's debt to White Oak. The defendant was authorized to issue corporate checks for business purposes only. The defendant did not obtain Donna Galluzzo's signature, his check supervisor, for any of the checks issued for the artwork. The defendant was not authorized by any Homecare officer to buy artwork for himself. The defendant never asked if he could buy artwork for himself using Homecare's funds. The defendant and Caslowitz contacted an attorney prior to the meeting with Donna Galluzzo and Gianfranco Galluzzo concerning White Oak's debt to Homecare, and whether the defendant and Caslowitz had a legal right to money due from that debt.

On the basis of the evidence, it was reasonable for the jury to find that the defendant had the intent to take moneys that he knew did not belong to him. Specifically, the jury could infer that the defendant knew he could not issue Homecare's checks for personal use, even though Homecare owed a debt to White Oak, a corporation in which the defendant was the majority shareholder, without having paid anything for the

---

[4] We note that there was conflicting evidence as to whether Homecare, in fact, was indebted to White Oak.

shares.[5] The defendant was the sole signatory for Homecare and was trusted to manage the finances of Homecare. Donna Galluzzo, the sole owner of Homecare, never authorized the defendant to issue Homecare's checks for the defendant's personal use. The defendant did not request or receive permission or authority from Donna Galluzzo to collect any debts allegedly owed to him, as the majority shareholder of White Oak. Customarily, Homecare transferred money monthly to White Oak to cover salaries and expenses and did not transfer money directly to individual shareholders of White Oak. The jury could infer that the defendant, as the accountant and chief financial officer for both Homecare and White Oak, must have known that a debt to White Oak is different from a debt to him personally, even if he was the majority shareholder of White Oak. See *State* v. *Radzvilowicz*, 47 Conn. App. 1, 19, 703 A.2d 767 ("It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that the title to the corporate property is vested in the corporation and not in the owner of the corporate stock. . . . Stockholders, even the controlling stockholder, cannot transfer or assign the corporation's properties . . . nor apply corporate funds to personal debts or objects . . . ." [Citations omitted; internal quotation marks omitted.]), cert. denied, 243 Conn. 955, 704 A.2d 806 (1997). The defendant refused to provide Homecare's financial records. The jury could have found that the defendant knew that the amount of the checks he wrote to the art vendors were not sums due to him as an employee of Homecare or as a majority shareholder

[5] The defendant argues that because he did not engage in forgery, deceit or concealment, he acted with an honest belief that he had a right to Homecare's funds. We note that such conduct goes to the weight of the evidence but does not necessarily preclude the jury from inferring from the circumstantial evidence that the defendant acted with the requisite intent necessary to commit the offense of larceny in the first degree. See *State* v. *McRae*, supra, 118 Conn. App. 319–20.

of White Oak.[6] Mindful of our standard of review, we conclude that there was sufficient evidence, from which the jury could find that the defendant possessed the requisite intent, to support his conviction of larceny in the first degree.[7]

## II

The defendant's second claim is that the court's jury instruction to use the information as a "road map" deprived him of his right to have the state prove each element of the offenses charged beyond a reasonable doubt. Specifically, he claims that the state did not have to prove the element of intent beyond a reasonable doubt because the information failed to allege expressly the "felonious" or "specific intent" element of the offense of larceny, and the court instructed the jury to use the information as a "road map." We disagree.

As a preliminary matter, we set forth the legal principles that govern our resolution of the defendant's claim and the applicable standard of review. The defendant

---

[6] We note that any money owed to White Oak was not due to the defendant individually. Furthermore, no evidence was introduced that the defendant sustained a loss separate and distinct from the corporate entity of White Oak or from that of the other shareholders. See *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 281–85, 422 A.2d 311 (1979). The defendant, by paying himself, rather than the corporate entity, was treating himself as having a greater right for payment due to his ownership of shares than the rights of other shareholders for payment. For example, Caslowitz, who retained a minority interest after his transfer of 85 percent of the stock to the defendant, never was paid anything for his retained minority interest in White Oak either by way of dividends or otherwise.

[7] We note that insufficiency of the evidence challenges to a defendant's convictions are not always treated consistently by appellate courts; see C. Ray & M. Weiner, "An Insufficient Truth," Connecticut Lawyer 38 (November 2009); but that almost complete deference is given to the factual conclusions reached by the fact finder. *State* v. *Morelli*, 293 Conn. 147, 152–53, 976 A.2d 678 (2009). As long as there is evidence from which a trier of fact could have found the facts and drawn the inferences leading to its guilty verdict, we are obliged to defer to those facts and inferences in passing on an insufficiency of the evidence claim. Id., 161.

failed to object to the instructions at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs of *Golding* involve a determination of whether the claim is reviewable, and the second two involve a determination of whether the defendant may prevail." (Citation omitted; internal quotation marks omitted.) *State* v. *Reeves*, 118 Conn. App. 698, 707, 985 A.2d 1068 (2010).

In this case, there is an adequate record and a claim of constitutional magnitude alleging the violation of a fundamental right. "[A]n improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process right to a fair trial, and thus require the reversal of a conviction based upon that instruction." *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995). Thus, resolution of the defendant's claim turns on whether the court's instruction to the jury about using the information as a road map amounted to a clear constitutional violation that clearly deprived the defendant of a fair trial. We conclude that such an instruction did not do so.

"It is well settled that jury instructions are to be reviewed in their entirety. . . . When the challenge to a jury instruction is of constitutional magnitude, the standard of review is whether it is reasonably possible that the jury [was] misled. . . . In determining whether

it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement . . . . Individual instructions also are not to be judged in artificial isolation . . . . Instead, [t]he test to be applied . . . is whether the charge . . . as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Brown*, 118 Conn. App. 418, 428–29, 984 A.2d 86 (2009), cert. denied, 295 Conn. 901, 988 A.2d 877 (2010).

The following additional facts are relevant for our resolution of the defendant's claim. During the court's instruction to the jury, the court referenced the information as a "road map." Specifically, the court stated: "[T]he information is nothing more than a charging document. Fairness requires in any case that when the state charges a person with a crime, the state should tell the jury and everybody else, including the defendant, what it is that the state claims the defendant did, and that's all the information is, is a statement of claims. It's not evidence, you cannot infer guilt from it. Whatever the state alleges in the information it has to prove by putting on its evidence during the course of the trial. So, just remember, and this term has been used already, *it's nothing more than a road map.* It's a charging document, and the reason I want you to understand that and the purpose is, when you deliberate shortly, the information is going to go into the jury room with you, and you should not give it any more significance than it is." (Emphasis added.) The defendant alleges that the court's instruction to use the information as a "road map" deprived him of his due process right to require the state to prove the element of specific intent for the offense of larceny because the information failed to articulate the specific intent element of larceny.[8]

---

[8] The defendant does not allege that he was misled about the elements of the crimes with which he was charged. The defendant concedes in his

First, the court clearly stated in its instructions that the information was simply a charging document. The record is clear that the court's instruction to use the information as a "road map" was to ensure that the jury considered each count of larceny that the defendant was charged with separately from the other counts.[9] Second, the court unambiguously and directly instructed the jury that the state had to prove the element of specific intent of the offense of larceny beyond a reasonable doubt for each count. The court first instructed the jury that "the state must prove every essential element of the crimes charged beyond a reasonable doubt." The court then instructed the jury on the elements of larceny, including the element of specific intent.[10] The defendant does not claim any error

brief that notice was provided as furnished in the original long form information filed on October 17, 2005, and by the state's reference to § 53a-122 (a) (2) in the operative information, which was filed on November 26, 2007.

[9] The court subsequently referenced the information as a "guidepost" in the following context: "In each count the defendant is charged with the crime of larceny in the first degree in violation of the Penal Code statute I've already referenced. Each count alleges a separate crime, although based upon the same section of the Penal Code. . . . *And in order to keep the evidence and counts separate, use each count as a guidepost.* Each count covers a separate alleged larceny and even though . . . from the same alleged owner, each count is based upon a different alleged larceny, which the state claims the defendant committed at a different time. There can be no spillover of evidence; that is, each count must be judged solely on the strength of the evidence that applies to it without regard to the others in any other count. I instruct you that your findings in any one count do not in themselves establish a basis for similar findings in any other count. For all practical purposes the defendant is to be considered on trial separately in each count." (Emphasis added.) The court again used the word "guidepost" as follows: "*Again, use the counts as guideposts to keep each alleged larceny separate.*" (Emphasis added.)

[10] The court stated: "A person commits larceny in the first degree as charged here when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner, and the value of the property is greater than $10,000. In any count, before you can find the defendant guilty of a larceny, each of the following elements must be proved by the state beyond a reasonable doubt, one, that the defendant wrongfully took, obtained or withheld property from an owner, and, two, that at the time

in those instructions. Furthermore, the court empha-
sized to the jury that it had to determine whether the
defendant had the requisite intent to commit the offense
of larceny when it stated: "In this case, the state claims
that the defendant . . . wrongfully took, obtained or
withheld money from his employer . . . Homecare
. . . by writing unauthorized checks to pay for various
items of art. The defendant claims that when he wrote
the checks to pay for the various pieces of art, that he
did not have any wrongful or unlawful intent. He claims
that he was entitled to the money. Keep in mind that
*the state has the burden to prove that the defendant
ha[d] the necessary criminal intent in accordance with
my instructions to commit the crime of larceny in
each count.* . . . As to any question of intent, you
should consider all the facts and circumstances con-
cerning the taking, obtaining or withholding of the prop-
erty. In order to determine whether the defendant

the defendant took such property or obtained it or withheld it, he intended
to deprive the owner of his property or to appropriate such property to
himself or a third person, and, three, that the value of the property in that
count was more than $10,000. Larceny means theft or stealing. The first
element that the state must prove beyond a reasonable doubt is that the
defendant wrongfully took, obtained or withheld the property of an owner.
Wrongfully means that there was no legal justification or excuse for the
taking, obtaining or withholding, and without the knowing consent of the
owner. Wrongfully also requires that the defendant have a dishonest or
felonious intent to defraud, cheat or deprive the owner of a property. This
dishonest or felonious intent must have existed in the defendant's mind at
the time of the act complained of. There can be no wrongful taking or
obtaining or withholding where such act was done with the knowing consent
of the owner. An act is done knowingly if done voluntarily and purposely,
and not because of mistake, inadvertence or accident. . . . Taking is a
wrongful taking of property from the possession or control of a person
entitled to the property, whether by force or some other unlawful means.
Obtaining is wrongfully obtaining the property or service from another or
wrongfully bringing about the transfer of a legal interest in the property or
service from the owner to the offender or a third person. It only means *not
only the true or lawful owner but any person who has a superior right to
that of the offender, and only can be either a person or a legal entity such
as a business partnership or corporation.* Withholding means wrongfully
keeping the property from its owner." (Emphasis added.)

honestly, in good faith, believed he had a bona fide right to the property, it will therefore be your duty to draw all reasonable and logical inferences from the conduct you may find the defendant engaged in, in the light of the surrounding circumstances, and, from this *determine whether the state has proven the element of intent beyond a reasonable doubt in each count.*"[11] (Emphasis added.) On the basis of our review of the court's entire charge, it was not reasonably possible that the jury was misled. The court properly stated the law on the element of intent. Accordingly, the defendant was not deprived of his due process right to have the state prove each element of the offense charged beyond a reasonable doubt.

### III

The defendant next claims that he was deprived of his right to a fair trial as a result of prosecutorial impropriety. Specifically, the defendant alleges numerous instances of prosecutorial impropriety in the prosecutor's closing and rebuttal arguments to the jury that, he claims, deprived him of a fair trial. The state asserts that the prosecutor's comments were not improper, and, even if they were improper, that they nevertheless did not prejudice the defendant so as to undermine the fairness of his trial. We conclude that the prosecutor's comments were not improper.

We begin by setting forth the applicable standard of review regarding claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to

---

[11] We also note that the jury requested and was provided with the written instructions on the element of intent.

a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial. . . .

"An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"In making the determination as to whether the prosecutor's conduct constituted impropriety, [w]e are mindful . . . of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent . . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake

should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Citation omitted; internal quotation marks omitted.) *State* v. *Holloway*, 116 Conn. App. 818, 836–37, 977 A.2d 750, cert. denied, 294 Conn. 902, 982 A.2d 646 (2009).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citation omitted; internal quotation marks omitted.) *State* v. *Velez*, 113 Conn. App. 347, 370, 966 A.2d 743, cert. denied, 291 Conn. 917, 970 A.2d 729 (2009).

The defendant alleges ten instances of prosecutorial impropriety in the prosecutor's closing and rebuttal

arguments that, he claims, deprived him of a fair trial.[12] He claims that the prosecutor, when addressing the jury, expressed his personal opinion regarding the defendant's guilt, expressed his personal opinion regarding what the law should be, gave improper direction on the relevance of evidence and improperly attempted to align himself with the jury through argument.

## A

First, the defendant argues that the prosecutor improperly expressed his personal opinion as to the defendant's guilt and improperly attempted to align himself with the jury with the following two remarks. First, the prosecutor stated: "[The defendant] used somebody else's checkbook to buy things that he kept for himself. That's stealing and everybody knows it." Second, the prosecutor stated: "Do you think he knew that you're not allowed to write checks to yourself off your employer's checkbook? Doesn't everyone know that? So, the question is, did he wrongfully take the money? Was he under an honestly entertained, mistaken or otherwise belief that he could do this?"

The prosecutor did not directly or indirectly express his personal opinion that the defendant was guilty. To the contrary, the prosecutor's statements clearly were intended to appeal to the jurors' common sense and to elicit a particular conclusion about the defendant's guilt

---

[12] In his factual summary of the case, the defendant asserts that there were two additional instances of prosecutorial impropriety in the following statements by the prosecutor: (1) "And once he started taking, he took and he took and he took again because nobody was questioning him. A $33,000 check to Sal Abbinanti. Nobody asked him about it, because no one was watching, and he knew it"; and (2) "He could have just made a book transfer, if he really believed that debt existed, but he didn't do it. He just took the neighbor's furniture." The defendant, however, did not brief those claims, and we decline to review them. See *418 Meadow Street Associates, LLC* v. *One Solution Services, LLC*, 117 Conn. App. 651, 655, 980 A.2d 345 (2009), cert. denied, 295 Conn. 907, 989 A.2d 602 (2010).

by inviting the jurors to draw reasonable inferences from the evidence presented to them. It is established that a prosecutor is not barred from "urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt." *State* v. *Long*, 293 Conn. 31, 38, 975 A.2d 660 (2009). Furthermore, "[i]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks." (Internal quotation marks omitted.) Id., 42. Moreover, contrary to the defendant's argument on appeal, the prosecutor's use of the word "everyone" was not an attempt by the prosecutor to improperly align himself with the jury but was an appeal to the jury to use its common sense in deciding the facts.

B

Second, the defendant argues that the prosecutor improperly expressed his personal opinion regarding the defendant's guilt and what the law should be, and improperly attempted to align himself with the jury with the following two analogies. First, the prosecutor stated: "Suppose you're working at McDonald's, and you've been there three years and your salary has gone up from whatever the minimum wage is now to, say, $8.50. And you're working one day and some new kid comes in and you're talking and you find out they're paying the new kid nine bucks. Well, you're not happy about this [b]ecause you put in three years of your life. Okay. So, you know what you ought to do, every hour you take fifty cents out of the till and put it in your pocket. Right? You know that's not what we do. You know that's not how the world works, not in America, it isn't, because that's just what the defendant did. If

in fact he even believed that there was such a debt
. . . . And you can easily conclude from this evidence
that he had no such belief at all."

Second, the prosecutor stated: "Assume that [Homec-
are] owed White Oak $5 million. Does that excuse the
defendant's act? Assume the debt is there. In this coun-
try, is that how we handle debts? You're at home, you
got a next door neighbor, he's got a big old tree. Last
night's storms—well, not last night, say the storms ear-
lier in the fall—his big old tree falls on your property,
and you hire somebody to come in and cut it up. It
costs you 600 bucks. Okay. So, you go to your neighbor
and you say, hey, it cost me 600 bucks to clean up your
tree; do you want to give it to me? Something, by the
way, [the defendant] never did. He never made a
demand for the debt that he claims now, that his counsel
now claims is owed. He never said pay us the money.
So, you go to your neighbor and you say, can I have
the 600 bucks I spent cleaning up your tree? And the
neighbor says, no. So, what do you do? Well, of course
you go into his house and you steal his furniture to pay
for the debt. . . . He said [Homecare] owes me the
money, so I'm just going to take it. He didn't sue, he
didn't demand money. He didn't even, having both sets
of books, transfer the money from [Homecare] to White
Oak, which he owned and take the money out of
White Oak."

The prosecutor did not directly or indirectly express
his personal opinion that the defendant was guilty. The
prosecutor did not express his personal opinion on
what the law should be through the use of these analo-
gies. The defendant objected to the second analogy at
trial, and the court overruled the objection, stating that
it was simply argument. The prosecutor used these anal-
ogies to demonstrate that people know it is wrong to
engage in self-help debt collection. The prosecutor was
appealing to the jurors' common sense to prove by

inference that the defendant did not have a good faith belief that he could satisfy a debt that his employer owed without permission or authority from his employer. The use of an analogy as a rhetorical device to make a point in closing argument is not prohibited. See *State* v. *Gilberto L.*, 292 Conn. 226, 250, 972 A.2d 205 (2009). The jurors reasonably could have viewed the analogies as an appeal to their common sense and not as a statement by the prosecutor on what the law should be. Last, the prosecutor's use of the word "we" in the first analogy is not an attempt to align himself improperly with the jury when examined in the context of the entire argument.

## C

Third, the defendant argues that the prosecutor improperly expressed his opinion on the defendant's guilt and improperly attempted to align himself with the jury with the following statement: "Now, sometimes cases can be complicated, and sometimes they can be really simple, and . . . this case is this simple. The money belonged to [Homecare], the defendant owned none of [Homecare], the defendant took the money from [Homecare]. He bought things for himself and he kept them. That's stealing. Everyone knows you can't buy stuff for yourself using someone else's checkbook. Everyone knows it. Everyone on this jury, everyone in this room. The defendant knows it just like you do. He didn't have a mistaken belief about anything. He just got caught." The prosecutor did not directly or indirectly express his personal opinion on the defendant's guilt. The prosecutor was appealing to the jurors' common sense. Last, in the context of the argument, the prosecutor's use of the word "everyone" was not an attempt to align himself improperly with the jury.

## D

Fourth, the defendant argues that the prosecutor gave improper direction on the relevance of evidence with

the following statements: (1) "Exhibit A, a lot of stuff was made out of these. . . . But you know what's really interesting about exhibit A? There is not a single check request in exhibit A that has anything to do with our charges, not one. This is a nonpiece of evidence. It doesn't mean anything because it doesn't have anything to do with our charges." (2) "All right. Payable to Heritage. Payable to Heritage. Payable to Sal Abbinanti,[13] but the date of the check is May 10, 2004, our first check to Sal Abbinanti that's charged in the information is in September of 2004. That's the only name that you're going to recognize in here, other than cash. Maybe you can know who Bank One is. So, what's this have to do with anything? One more piece of evidence that means absolutely nothing to what we have to prove, but a lot was made of it in closing argument, about how he was so open, and even if these were written, of course, you know that they just went in a drawer; it's not like they were handed to the bosses when they came in for the financials." (3) "[Homecare] isn't on trial here. All that matters for this trial is whether [the defendant] stole money from [Homecare]. And for purposes of these charges, and this is the most important part, given what you just heard, it doesn't even matter whether [Homecare] actually owed a debt to White Oak or not because that's not the question." (4) "And what his—what his experts testified about was this debt, which is basically irrelevant, whether the debt existed or not because it's not how you collect a debt, and everyone knows it."

"It is well settled that a prosecutor must not comment on evidence that is not part of the record, nor is he to comment unfairly on the evidence adduced at trial so as to mislead the jury." (Internal quotation marks omitted.) *State* v. *Ayuso*, 105 Conn. App. 305, 329, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008). On

[13] Sal Abbinanti is an art dealer to whom one of the Homecare checks signed by the defendant was payable.

the basis of our review of the record, we conclude that the prosecutor's remarks constituted fair comment asking the jury to draw reasonable inferences from the evidence presented at trial.

### E

Last, the defendant argues that the prosecutor improperly attempted to align himself with the jury with the following statement: "The common sense picture of the world that all of us have and all of you know is as simple as what was said before. Everyone knows that you can't buy yourself stuff out of someone else's checking account. He's not taking the money from White Oak. If he had done that, maybe the claim that he owned it would fly. He's taken it from his employer just as certainly as if you took your neighbor's furniture. You know that you can't do that. Accountants know it, and he knew it when he stole the money, and he knew it when he hid his actions in this big pile of paper. And because he knew it, the rest is simple because everyone knows the rest is simple. We need to hold him accountable." The prosecutor's use of the word "everyone" was an appeal to the jury to use its common sense in deciding the facts. The prosecutor's statement, "[w]e need to hold him accountable," also did not rise to the level of prosecutorial impropriety. The statement was made in the prosecutor's final remark to the jury after he recounted all of the critical evidence introduced at trial. "When reviewing a claim of prosecutorial impropriety, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 45, 917 A.2d 978 (2007). In reviewing the comment in context, the prosecutor did not improperly attempt to align himself with the jury.

For all of the foregoing reasons, we conclude that there was no prosecutorial impropriety, in isolation or combination, that deprived the defendant of a fair trial.

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

ALVORD, J., dissenting. "It is axiomatic that the state's burden of proof beyond a reasonable doubt applies to *each and every element* comprising the offense charged." (Emphasis added; internal quotation marks omitted.) *State* v. *Williams*, 220 Conn. 385, 398, 599 A.2d 1053 (1991). In the present case, the defendant, John Papandrea, was charged with nine counts of larceny in the first degree. In order for the jury to have found him guilty of those offenses, the state was required to prove that he had the felonious intent to deprive Homecare Management Strategies, Inc. (Homecare), of its property. Because I believe that the state failed to prove that essential element of the charged offenses beyond a reasonable doubt, I respectfully dissent.

The defendant never disputed that he had issued a number of checks, drawn on Homecare's accounts payable, to purchase artwork. He never claimed that he was authorized by Donna Galluzzo, the sole stockholder of Homecare, to issue those checks. His defense was that he honestly believed that he had a right to those funds because of the legitimate debt of more than $5 million owed by Homecare to White Oak Systems, LLC (White Oak), a company in which he held 85 percent of the stock. The testimony and exhibits admitted at trial supported that defense and failed, in my opinion, to prove that the defendant acted with the subjective knowledge that his actions constituted stealing. See *State* v. *Varszegi*, 33 Conn. App. 368, 372–74, 635 A.2d

816 (1993), cert. denied, 228 Conn. 921, 636 A.2d 851 (1994).[1]

Not surprisingly, there is no direct evidence of intent in this case. In such circumstances, intent may be inferred from circumstantial evidence, such as the events that occurred before and after the charged offenses, and the jury may infer that the defendant intended the natural consequences of his actions. See *State* v. *McRae,* 118 Conn. App. 315, 320, 983 A.2d 286 (2009). The majority concludes that the requisite specific intent can be inferred because (1) the defendant did not pay anything for his shares of stock in White Oak, (2) Donna Galluzzo did not authorize the defendant to issue Homecare's checks for his personal use, (3) the defendant did not request or receive permission to collect any debts owed to him as the majority shareholder of White Oak and (4) a debt owed to a corporation such as White Oak cannot be collected by a shareholder as a personal debt.[2] I do not believe that the reasons relied on by the majority are sufficient to establish the mens rea for larceny in the first degree. Those reasons are not inconsistent with the defendant's defense that he was entitled to those funds. Further, there was overwhelming evidence that supported his defense.

Masonicare entered into a contract with Homecare in 1999 for financial support services.[3] Under the express terms of that contract, Homecare was paid $8 per patient visit. Of that amount, the contract provided that

---

[1] "If a person takes property in the honest, though mistaken belief, that he has a right to do so, he has not committed larceny." *State* v. *Varszegi,* supra, 33 Conn. App. 374.

[2] No evidence was submitted at trial regarding White Oak's corporate structure or the rights of its majority and minority shareholders.

[3] The testimony at trial established that Masonicare, a health care provider, received its funds from medicare and medicaid. Masonicare then paid Homecare pursuant to the terms of this contract.

Homecare was to pay White Oak $4.57 for its software development supporting that patient care. The defendant claimed that the contractual per patient payment was never transferred by Homecare to White Oak, and the defense presented evidence, including the testimony of an expert witness and documentation, that indicated the debt to White Oak under the Masonicare contract had reached approximately $5.4 million at the time the Masonicare contract ended on September 30, 2004.[4]

---

[4] Footnote 4 of the majority opinion states that "there was conflicting evidence as to whether Homecare, in fact, was indebted to White Oak." That conflicting evidence primarily consisted of testimony that, despite the terms of the written Masonicare contract obligating Homecare to pay $4.57 of every $8 paid by Masonicare per patient visit to White Oak, Homecare and White Oak had a *verbal* agreement to disregard that provision of the Masonicare contract. Carl Caslowitz, one of the original founders and the majority shareholder of White Oak, testified that the verbal agreement, which involved millions of dollars, was made by him on behalf of White Oak and by Donna Galluzzo and Gianfranco Galluzzo on behalf of Homecare. Caslowitz and Gianfranco Galluzzo are both attorneys. Gianfranco Galluzzo dictated the terms of the verbal agreement even though he had no ownership interest in Homecare. This verbal agreement to ignore the written provision of the Masonicare contract was not disclosed to Masonicare, medicare and medicaid.

Caslowitz admitted that Homecare owed a debt to White Oak but claimed that White Oak never expected to collect it because of the verbal agreement. Donna Galluzzo, when asked if Homecare owed White Oak millions of dollars, responded that she did not know; she did not deny the existence of a debt. Gianfranco Galluzzo, the spouse of Donna Galluzzo, testified that, "in my mind," Homecare never owed White Oak millions of dollars.

Gianfranco Galluzzo denied the existence of the debt but qualified his responses with disclaimers such as "in my mind" or "as far as I know." Moreover, when considered in the context of his entire testimony at trial, the significance of those equivocal statements is severely diminished. Gianfranco Galluzzo testified that he was a consultant for Homecare and oversaw the financial stability of that company. He received $500,000 in December, 2000, for services rendered to Homecare. A few days later, he requested and received a check in the amount of $250,000 from White Oak for his services as a consultant. Despite his claimed role as a financial consultant at the companies, he testified that he was "not totally familiar with [the Masonicare contract]," even though the majority of Homecare's revenue from 2000 to 2004 was derived from Masonicare. He testified that he did not know all the terms of the contract and had not read it "cover to cover."

In connection with implementing the Masonicare contract, Gianfranco Galluzzo, Donna Galluzzo's husband, directed Carl Caslowitz[5] to transfer 85 percent of White Oak's stock to the defendant, for "corporate convenience" and for no consideration. Caslowitz testified that he agreed to the transfer because Homecare was White Oak's principal client. He also testified that the stock had little or no value at that time. All of the checks used to purchase artwork had been issued while the defendant owned 85 percent of White Oak's stock.[6]

Upon the transfer of the stock, the defendant became the chief financial officer of White Oak, and, according to the testimony of Caslowitz, the defendant performed all of the functions normally performed by the chief financial officer of a company. He attended design meetings, assisted with the billing software, prepared and maintained the financial records for White Oak and

---

Further, he testified that he did not know the cash flow from Masonicare to Homecare because "I never looked at these financials."

The defendant's employment was terminated at the April 1, 2005 meeting, when Gianfranco Galluzzo discovered that the defendant had transferred the White Oak stock back to Caslowitz. Caslowitz testified that after the meeting, Gianfranco Galluzzo now wanted Caslowitz to transfer the White Oak stock to him. As requested, shortly after that meeting, Caslowitz transferred 65 percent of his stock in White Oak to White Oak Holdings, a company owned by Donna Galluzzo, and was paid $500,000 for that interest. Caslowitz testified that the debt to White Oak was eliminated at that time.

On the basis of the foregoing testimony, the evidence supported the defendant's claim that he had a good faith belief that Homecare owed White Oak over $5 million dollars under the terms of the Masonicare contract. No evidence was presented at trial that indicated that the defendant did not have a good faith belief that the debt to White Oak was legitimate.

[5] At the time of trial, Caslowitz was employed by White Oak as its president and chief executive officer. Sixty-five percent of the stock of White Oak then was held by White Oak Holdings, 13.75 percent by Caslowitz, 13.75 percent by Roger Palombizio and 7.5 percent by Terri Fox.

[6] While no evidence was submitted regarding the rights of the majority and minority shareholders of White Oak, we note that the total amount of the funds claimed to have been misappropriated by the defendant was substantially less than 85 percent of the $5.4 million debt owed White Oak by Homecare.

coordinated the working relationship between Homecare and White Oak. He did not, however, receive a salary from White Oak. Caslowitz testified that the company gained in value. Caslowitz was concerned, however, about the viability of White Oak when the Masonicare-Homecare contract ended in September, 2004. Masonicare was Homecare's largest customer, and the Masonicare contract had been the primary source of Homecare's revenue from 2000 to 2004.

With the approaching end of the Masonicare contract, and the uncertainty of the future for both Homecare and White Oak, the defendant's actions indicated that he was concerned about the collection of the debt owed to White Oak.[7] As confirmed by Donna Galluzzo's testimony, she returned as full-time president of Homecare

[7] From the testimony and exhibits, it reasonably could be inferred that the defendant particularly was concerned about moneys being available to satisfy the debt to White Oak because of the manner in which Gianfranco Galluzzo operated the companies. Even though he had no direct interest in Homecare, he acted as though he owned the company, and he directed the way payments were made between Homecare and White Oak. On occasion, he would ask Cindy O'Sullivan, the director of finance at Homecare, to issue checks payable to cash for his use. He requested and she issued checks totaling $750,000 from Homecare and White Oak in 2000 for his consulting services. Gianfranco Galluzzo also was involved in outside projects, including the construction of houses and other buildings, and he authorized checks to be paid from Homecare's accounts in amounts totaling hundreds of thousands of dollars payable to contractors, lumber companies and building supply companies. He admitted that those expenses were totally unrelated to health care.

It is interesting to note that many of those construction contractors are on Homecare's approved vendors list. That list was created after the April 1, 2005 meeting. Gianfranco Galluzzo is not on the list. Robert Zdon, the accountant for both Homecare and White Oak, testified that Bernie Williams *is* one of the names on the approved vendors list. During the trial, O'Sullivan provided an explanation for the identification of Bernie Williams as a Homecare approved vendor. In December, 2000, Gianfranco Galluzzo requested that O'Sullivan issue a check, from Homecare's accounts, payable in the amount of $500,000. In determining the person to whom it should be made payable, O'Sullivan selected the name Bernie Williams because of a baseball card on her desk.

in early 2004 because its major contract with Masonicare would be ending, and she had to decide whether to close Homecare or to continue the business without that contract. It was around this time, on February 24, 2004, that the defendant authorized the issuance of the first check from Homecare's accounts payable to purchase artwork.

The defendant's subsequent actions also support his claim of entitlement to the moneys taken on behalf of White Oak. Caslowitz testified that he met with the defendant weeks before the April 1, 2005 meeting. At that time, the defendant initiated a conference call to his attorney to discuss the possibility of bringing a lawsuit against Homecare to collect the debt owed to White Oak pursuant to the terms of the Masonicare contract. Caslowitz also testified that prior to the April 1, 2005 meeting, the defendant told him that he wanted to enforce the Masonicare contract and that he was concerned that Gianfranco Galluzzo wanted to eliminate the debt due White Oak. The defendant indicated that one of the reasons that he had scheduled the April 1, 2005 meeting was to discuss the relationship between Homecare and White Oak.[8] On March 30, 2005, immediately prior to the scheduled meeting, the defendant transferred his entire interest in the White Oak stock back to Caslowitz.

Perhaps the most compelling reason for concluding that the state failed to prove felonious intent beyond a reasonable doubt is the evidence that the defendant's actions were taken openly and that he did not attempt to conceal what he had done. When he requested a check for payment for artwork, he did not use a fictitious name for the party to be paid or request that the

---

[8] Caslowitz testified that the defendant scheduled the April 1, 2005 meeting. Although Donna Galluzzo testified that she was upset about the delay, she also testified that the defendant indicated that he was servicing clients and that it was customary to give client demands top priority.

check be made payable to cash. The checks, in sizeable amounts that would have attracted attention, were signed by the defendant and were made payable to individuals or to such companies as Rainmakers, Profiles in History, E.S. Lawrence Gallery and Fanfare Sports and Entertainment. On the check request forms, the defendant noted "partial payment of White Oak fee" and "due to [White Oak]" as the reasons for the requests. In Homecare's general ledger, the defendant deducted the amounts of the checks issued for artwork from the debt due White Oak from Homecare. In short, the defendant did not use fictitious payees or falsify documents, and there was no evidence whatsoever that Donna Galluzzo was unable to access Homecare's financial records. Further, the defendant ordered the artwork via his e-mail account at Homecare and had the artwork delivered to Homecare's corporate offices. He displayed the artwork in Homecare's offices.

Our case law quite clearly permits the inference of felonious intent when a defendant actively conceals his or her actions. In *State* v. *Dell*, 95 Conn. App. 24, 894 A.2d 1044, cert. denied, 278 Conn. 919, 901 A.2d 44 (2006), this court concluded that the trial court, as the fact finder, reasonably could have concluded that the evidence did not support the defendant's claim that he was entitled to the funds that he had embezzled as the treasurer of a nonprofit organization. The trial court had found that the defendant "engaged in a secret pattern of behavior, appropriating the moneys to himself in such a manner as to conceal the true nature of his activities from others . . . ." Id., 29. The trial court further found that "there was no credible evidence that the defendant was entitled to the moneys at issue . . . ." Id. In affirming the judgment, we noted: "The [trial] court reasoned that the secretive and deceptive nature of the defendant's conduct made it less likely that the defendant acted under a claim of right. Under the facts

of [*Dell*], such an inference was sound. The findings that the defendant acted in a secretive and deceptive manner, that the defendant appropriated the moneys at issue without authorization to do so, that no credible evidence supported the defendant's claim that he was entitled to the moneys at issue, that no credible evidence supported the defendant's claim that he acted with a good faith belief that he was entitled to the moneys at issue and that the defendant was experiencing financial problems at the time he appropriated the moneys at issue were significant." Id., 30–31. We therefore concluded that the evidence amply supported the trial court's ultimate finding that the defendant had appropriated the moneys wrongfully without a subjective belief that he was honestly entitled to do so. Id., 31.

While secretive conduct may belie a defendant's claim that he acted in accordance with a claim of right, actions taken openly and without concealment tend to strengthen a claim that a defendant acted in good faith under a claim of right. In *State* v. *Varszegi*, supra, 33 Conn. App. 368, this court concluded that the evidence was insufficient to prove beyond a reasonable doubt that a landlord had the requisite felonious intent to support a conviction of larceny in the third degree for taking his tenant's computers. The landlord claimed that he had a right to take the property because the tenant had defaulted in its rent payments, and their lease authorized the landlord to enter the tenant's premises and to seize personal property to recover unpaid rent. The landlord had entered the premises by picking the lock and, when confronted by a police officer, admitted that he had taken the computers and expressed his belief that his actions were proper and legal. Even though that police officer, and the officer's supervisor, told the landlord that they doubted that the defendant's conduct was lawful, the landlord sold the computers

to recoup the unpaid rent despite the advice of law enforcement officials. Id., 370–71.

In reversing the judgment of conviction, this court first quoted from various sections and comments in American Jurisprudence that it found particularly apposite to the claim of right defense. "One who takes property in good faith, under fair color of claim or title, honestly believing that . . . he has a right to take it, is not guilty of larceny even though he is mistaken in such belief, since in each case the felonious intent is lacking. . . . The general rule applies . . . to one who takes it with the honest belief that he has the right to do so under a contract . . . .

"[I]t is generally held that because of a lack of felonious intent, one is not guilty of larceny who, in the honest belief that he has the right to do so, openly and avowedly takes the property of another without the latter's consent, as security for a debt bona fide claimed to be due him by the owner, or even to apply or credit it to the payment thereof." (Citation omitted; internal quotation marks omitted.) Id., 373. This court then held that "[i]f a person takes property in the honest, though mistaken belief, that he has a right to do so, he has not committed larceny." Id., 374. We concluded that the evidence in *Varszegi* was insufficient to prove felonious intent because the defendant "made no attempt to conceal either his identity or that he had in fact taken the computers. . . . Moreover . . . the defendant never wavered from his contention that his actions were lawful . . . ." Id., 375.

Similarly, in the present case, the defendant's actions were not secretive or deceptive. He was consistent in his position that White Oak was due moneys from Homecare under the terms of the Masonicare contract. When the Masonicare contract was coming to an end and the financial viability of the companies was questionable, the defendant began authorizing the checks

at issue and deducted those amounts from the debt to White Oak. Further, prior to the April 1, 2005 meeting, he had expressed his concern to Caslowitz that Gianfranco Galluzzo wanted to eliminate the White Oak debt.

Under those circumstances, I cannot agree with the majority that inferences can be drawn from the evidence presented at trial that the defendant had the requisite felonious intent to support a conviction of larceny in the first degree. In my opinion, the evidence was insufficient to prove beyond a reasonable doubt that he acted with the subjective knowledge that he was wrongfully depriving Homecare of its property but, rather, was overwhelmingly supportive of his claim that he believed that he had a right to those funds as the majority shareholder in White Oak. "[W]e will reverse a judgment where the state's evidence is improbable and unconvincing and where all the facts found are insufficient to prove the guilt of the defendant beyond a reasonable doubt. . . . The case where that occurs is rare, and rightfully so, because of the great deference afforded the factual findings of the trier. *This, however, is one of those rare cases.*" (Citations omitted; emphasis added.) *State* v. *Osman*, 218 Conn. 432, 437, 589 A.2d 1227 (1991).

For those reasons, I would reverse the judgment of the trial court and remand the case with direction to vacate the conviction of nine counts of larceny in the first degree. Accordingly, I respectfully dissent.