******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SARA E. VANDEUSEN
(AC 35504)

DiPentima, C. J., and Prescott, and Bear, Js.

*Argued April 7—officially released November 3, 2015*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *Dawn Gallo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Sara E. VanDeusen, appeals from the judgment of conviction, rendered after a jury trial, of one count of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48; one count of being an accessory to an attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1), 53a-49 (a) (2), and 53a-8; and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). In addition, the jury also found, pursuant to an interrogatory on each count, that "the defendant or another participant used or was armed with and threatened the use of or displayed a firearm," and the court accordingly enhanced her sentence pursuant to General Statutes § 53-202k.

On appeal, the defendant claims that (1) the evidence was insufficient to support her conviction of conspiracy and attempt to commit assault in the first degree, and of risk of injury to a child, (2) the trial court improperly instructed the jury on the elements of conspiracy and attempt to commit assault in the first degree, and (3) the court improperly enhanced her sentence on the counts of conspiracy to commit assault in the first degree and risk of injury to a child pursuant to § 53-202k. We affirm the judgment of the court with respect to the first and the second claims. With respect to the third claim, we agree with the defendant that the court improperly enhanced her sentence on the counts of conspiracy to commit assault in the first degree and risk of injury to a child. We, thus, affirm the trial court's judgment in part and reverse it in part.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The charges against the defendant stem from a shooting that occurred on the evening of January 10, 2009, in Torrington at the residence of J.L., her then three year old son, A.S., and her boyfriend, Gregorio Rodriguez.[1]

Prior to the shooting, the defendant and J.L. were good friends and had several mutual acquaintances, including the defendant's roommate, Carlos Casiano, as well as Alyssa Ayala and her boyfriend, Charles Knowles. At some point, however, the relationship between J.L. and Ayala became antagonistic because J.L. had a sexual encounter with Knowles in October or November, 2008. Once Ayala had learned of the encounter, she became angry with J.L. and threatened to "fuck that bitch up for messing with [her] man . . . ."

At the same time, the relationship between Rodriguez and Knowles also became antagonistic. Both were drug dealers, but belonged to two rival gangs. On January 9, 2009, Knowles and Rodriguez engaged in a fistfight

at a local pub. As a result of the fight, Knowles suffered a broken facial bone, for which he sought treatment at a hospital the following day.

At the hospital, Knowles was accompanied by Ayala and Casiano. While waiting at the hospital, the trio discussed going to J.L.'s and Rodriguez' residence to "get back at them." Ayala, however, was concerned that neither Knowles nor she herself could participate in a physical altercation.[2] Ayala then called the defendant and explained to her the nature and extent of Knowles' injury.

The defendant later arrived at the hospital to pick up Ayala and Knowles. Once she had seen the extent of the injury, the defendant offered to fight J.L. instead of having Ayala fight J.L. because, according to the defendant, J.L.'s sexual relationships with both Rodriguez and Knowles had instigated the fight at the pub the previous night.

Ayala thereafter placed several telephone calls from a private number to J.L.'s residence, trying to ascertain whether she and Rodriguez were there by pretending to be someone else looking for Rodriguez. Having nevertheless recognized Ayala as the caller, J.L. told her that Rodriguez was home and further remarked that her minor child was also at home.[3]

Alarmed by Ayala's calls, J.L. called the defendant and told her that Ayala was "trying to start problems . . . ." During that conversation, J.L. threatened to "kick [Ayala's] ass" and stated that she had sexual intercourse with Knowles throughout the entire time that Ayala had been dating him. In addition, J.L. gave the defendant her new address, adding that Ayala could come over if she wanted to have an altercation.[4]

The defendant then called Ayala and relayed to her the essence of her conversation with J.L. and, once again, volunteered to fight in Ayala's stead. Knowles overheard J.L.'s challenge and became "mad" because J.L. had threatened to beat up his pregnant girlfriend. Knowles then called Casiano and asked Casiano to fight Rodriguez. Knowles also told Casiano to come get him at Ayala's residence and to bring the defendant because "she was the only one [who] knew where [J.L.] lived . . . ." Knowles then mentioned to Casiano that he had a gun. After the call to Casiano, Knowles also called his mother in New York and told her that he would be coming back there.[5]

Thereafter, Casiano and the defendant picked up Knowles in a green van. Before leaving Ayala's residence, Knowles retrieved a handgun from a shoe box in a bedroom closet. The trio then headed to J.L.'s residence. On the way to J.L.'s residence, the defendant saw that Knowles was armed. Despite her knowledge of the handgun, after pulling up in front of J.L.'s residence, the defendant called J.L. from her cellular phone

and asked her and Rodriguez to come out of the house. Sensing trouble, J.L. refused to come out, hung up the telephone, and turned off the lights in the living room, which was facing the street.

Once the defendant, Casiano, and Knowles realized that J.L. and Rodriguez were not going to come out, Knowles opened the van's door and fired his handgun at the residence. Inside of the residence, Rodriguez and J.L.'s friend, Casey Delmonte, who were watching television in a back bedroom, heard "a very loud noise . . . ." When Delmonte went to the living room window to investigate, she saw the taillights of a "bigger vehicle" as it drove away. At that time, none of them realized that they had heard the sound of gunshots.

Later that evening, however, J.L., Rodriguez, and Delmonte discovered that a bullet had pierced the front door window and lodged in a wall separating the entryway and the bedroom where Rodriguez, Delmonte, and A.S. had been watching television at the time of the shooting. The bullet had struck the wall at four feet, two inches above the floor. In addition, it was later discovered that a second bullet had struck a supporting pillar on the front porch of the residence.

Following the shooting, Knowles directed Casiano and the defendant to dispose of the gun by delivering it to someone in Waterbury. Thereafter, Knowles and Casiano went into hiding, ultimately ending up in New York. Ayala later also joined Knowles in New York. The defendant did not leave Torrington following the shooting. When the defendant was later interviewed by the police in connection with the shooting investigation, she denied any knowledge of the shooting and stated that she could not recall her whereabouts on the night in question. The defendant further stated that she did not know Knowles and that she had not called J.L. on the day of the shooting.

As a result of the investigation, the defendant was arrested on August 5, 2009, and charged with one count of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1); one count of being an accessory to an attempt to commit assault in the first degree in violation of §§ 53a-59 (a) (1), 53a-49 (a) (2) and 53a-8; and one count of risk of injury to a child in violation of § 53-21 (a) (1). In addition, the state sought to enhance the defendant's sentence on all counts pursuant to § 53-202k.

Following a trial, the jury found the defendant guilty as charged on all counts. Thereafter, the court sentenced the defendant to ten years incarceration, execution suspended after five years, followed by five years enhancement, pursuant to § 53-202k, on each count, to run concurrently, for a total effective sentence of fifteen years incarceration, suspended after ten years, followed by five years probation.[6] This appeal followed. Addi-

tional facts and procedural history will be set forth as needed.

# I

## SUFFICIENCY OF EVIDENCE

We begin with the defendant's challenge to the sufficiency of the evidence to support her conviction of conspiracy to commit assault in the first degree, attempt to commit assault in the first degree as an accessory, and risk of injury to a child.

It is well settled that a defendant who "asserts an insufficiency of the evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798, cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). "[F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." (Internal quotation marks omitted.) *State* v. *Nasheed*, 121 Conn. App. 672, 682, 997 A.2d 623, cert. denied, 298 Conn. 902, 3 A.3d 73 (2010). "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014).

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw

whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Papandrea*, 302 Conn. 340, 348–49, 26 A.3d 75 (2011).

Finally, on appeal, we do not "ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 594, 72 A.3d 379 (2013).

A

The defendant first claims that there was insufficient evidence to prove beyond a reasonable doubt that she "had the requisite intent for the underlying crime of first degree assault . . . ." According to the defendant, she could not have been found guilty of conspiring to commit assault in the first degree (count one) and attempt to commit first degree assault as an accessory (count two) because there "was utterly no evidence that she agreed or intended for anyone to be shot." We are not persuaded.

Because both counts one and two required the state to prove, among other things, that the defendant intended that she or another participant commit an assault in the first degree, we discuss these counts together.

Section 53a-59 (a) (1) provides that a person is guilty of assault in the first degree if "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

As to count one, which charged conspiracy to commit first degree assault, we note that "[t]o establish the crime of conspiracy under § 53a-48 . . . the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . [Although] the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as

we have an agreement. . . .

"The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Douglas*, 126 Conn. App. 192, 201–203, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

With respect to count two, which charged the defendant with attempt to commit first degree assault as an accessory, we note that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a). As to accessorial liability, "[a] person, acting with the mental state required for commission of an offense, who . . . importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." General Statutes § 53a-8 (a).

Finally, it is settled that the question of "intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence. . . . Intent may be and usually is inferred from conduct. . . . [W]hether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Douglas*, supra, 126 Conn. App. 204. Moreover, intent "may be inferred from circumstantial evidence such as the events leading to and immediately following the incident, and the jury may infer that the defendant intended the natural consequences of his actions." *State* v. *McRae*, 118 Conn. App. 315, 320, 983 A.2d 286 (2009); see also *State* v. *Douglas*, supra, 204 ("[t]he defendant's state of mind may be proven by his conduct before, during and after the shooting" [internal quotation marks omitted]). With these principles in mind, we now turn to the substance of the defendant's claim.

In her brief, the defendant argues that the "evidence in the present case shows nothing more than an

agreement between [the] defendant, Knowles and [Casiano] to go to [J.L.'s] house so that the defendant could fight [J.L.] and [Casiano] could fight Rodriguez, and that the shooting by Knowles was an unplanned and unanticipated occurrence sparked by the refusal of [J.L.] and Rodriguez to exit the home." Because we conclude that the state presented sufficient evidence for the jury to find beyond a reasonable doubt that the defendant had the requisite intent that she or another participant cause serious physical injury to another person, we reject the defendant's claim.

Ayala testified that the defendant admitted to her that, prior to the shooting, she saw the gun behind Knowles' belt buckle. She also saw him transfer it to his lap on the way to J.L.'s residence. On the basis of this evidence, the jury, using its common sense, reasonably could have inferred that, having seen the gun at the ready on Knowles' lap, the defendant must have realized that Knowles intended on using it against J.L. and/or Rodriguez. See *State* v. *Lavigne*, 121 Conn. App. 190, 196, 995 A.2d 94 (2010) ("[triers of fact] are not required to leave common sense at the courtroom door" [internal quotation marks omitted]), aff'd, 307 Conn. 592, 57 A.3d 332 (2012); see also *State* v. *Booth*, 250 Conn. 611, 656–57, 737 A.2d 404 (1999) (unarmed defendant's knowledge that codefendants were armed established that he conspired and intended that he or coconspirator would kill victim), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). As the state correctly points out in its brief, despite that knowledge, the defendant "continued guiding her cohorts to J.L.'s home and then called J.L. in an attempt to lure her and Rodriguez outside." See *State* v. *Millan*, 290 Conn. 816, 828, 966 A.2d 699 (2009) ("[a] coconspirator's conduct at the scene can provide the requisite evidence of an agreement"); *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992) ("[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . The fact that the defendant stood by silently when a gun was displayed in order to gain entry and then to intimidate the occupants of the premises is evidence from which the jury might reasonably have inferred the defendant's acquiescence in this enlarged criminal enterprise." [Citation omitted.]); *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714 ("the jury could have based at least part of its decision regarding the conspiracy charges on the defendant's decision to come to the scene of the crime with the coconspirators, stay at the scene while the crimes were committed and leave the scene with the coconspirators"), cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).

In addition, the jury reasonably could have inferred that the defendant had the requisite intent that she or

a coconspirator cause serious physical injury to another person from the evidence that, following the shooting, she fled the scene with Knowles and Casiano, helped Knowles to dispose of the gun by handing it over to someone in Waterbury, and later lied to the police about her involvement in the crime. See *State* v. *Wright*, 77 Conn. App. 80, 93, 822 A.2d 940 (fleeing with codefendant who remained in possession of gun after shooting is indicative of intent to commit murder), cert. denied, 266 Conn. 913, 833 A.2d 466 (2003); *State* v. *Patterson*, 229 Conn. 328, 334, 641 A.2d 123 (1994) (concealment of weapon after crime establishes consciousness of guilt); see also *State* v. *Booth*, supra, 250 Conn. 657 ("the jury reasonably could have concluded that [the defendant] lied to the police to cover up his part in the crime").

We thus conclude that there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that the defendant had the requisite intent that she or another participant cause serious physical injury to another person, that is, an assault in the first degree. Accordingly, the defendant's claim must fail.

B

The defendant next claims that, with respect to the charges of conspiracy to commit assault in the first degree and attempt to commit assault in the first degree as an accessory, there was insufficient evidence to prove beyond a reasonable doubt that she agreed or intended that the person to be injured was Rodriguez. Specifically, the defendant argues that the state's theory of the case was that the intended target of the assault had been Rodriguez, but, according to the defendant, the state proved only that she intended to assault J.L. and failed to prove that she intended that Rodriguez be assaulted. The defendant further argues that because the state's theory at trial was that Rodriguez had been the intended target, the state cannot on appeal "proceed on a new theory" that evidence of the defendant's intent to assault J.L. was sufficient to sustain the state's burden of proof on counts one and two. Alternatively, the defendant argues that the state also failed to establish beyond a reasonable doubt that Knowles and Casiano shared an intent to assault J.L., and that she could not have conspired with them to have J.L. assaulted. We are not persuaded by any of these insufficiency claims.

The following additional facts are relevant to these claims. Prior to trial, on May 29, 2012, the defendant filed a motion "for long information or bill of particulars," seeking, inter alia, that the state identify "[t]he person and or persons a [sic] victim of all crimes charged . . . ." In response, on May 31, 2012, the state filed a long form information, charging the defendant in count one with, among other things, conspiracy to commit assault in the first degree. Although the state did not specify any of the intended victims of the assault

in that count, the state alleged, as part of the overt acts committed in furtherance of that conspiracy on January 10, 2009, that the defendant, Knowles, and Ayala, "discussed retribution against . . . Rodriguez," Ayala then called J.L. "in an attempt to confirm whether [J.L.] and [Rodriguez] were located at [J.L.'s] home," the defendant "discovered [J.L.'s] new address" and then "called [J.L.] requesting that she and [Rodriguez] exit [J.L.'s] home while one or more coconspirators were in the area . . . ." In count two of the long form information, which alleged an attempt to commit assault in the first degree as an accessory, the state did not specify an intended victim.[7] The defendant did not file a new motion for a bill of particulars or otherwise object to the long form information.

As noted previously, during trial, the state presented evidence that the defendant conspired and attempted to help Knowles to get back at Rodriguez for the injury he had inflicted on Knowles during the fight. In pursuit of that goal, the defendant personally guided Casiano and Knowles to J.L.'s residence and then attempted to lure her and Rodriguez to come out of the house. The evidence also established that the defendant, believing that J.L. had been the actual instigator of the fight between Knowles and Rodriguez, sought to take revenge on J.L. and travelled to her residence with Casiano and Knowles in an attempt to assault her. Furthermore, the state also presented evidence that Knowles also intended for the defendant to fight J.L. and instructed Casiano to bring the defendant along because he had been angered by J.L.'s threats to Ayala, his then pregnant girlfriend.

After the close of evidence, the prosecutor argued to the jury that the defendant had conspired to drive "to [J.L.'s] and Gregorio Rodriguez' house on January 10, 2009, under cover of darkness to shoot at *them* . . . ." (Emphasis added.) In addition, when summarizing Ayala's testimony, the prosecutor argued that the defendant "was shocked when she saw Charles Knowles' facial injury, and that she offered to beat [J.L.] up to be a full part of this retaliation *against this couple* . . . ." (Emphasis added.) Similarly, during rebuttal argument, the prosecutor argued that the defendant called J.L. "to get her and Greg [Rodriguez] to come outside. . . . She called *them* to come out so they could shoot *them*." (Emphasis added.) Finally, in conclusion, the prosecutor argued that the defendant "didn't ride along to go to Dairy Queen that night. They met at the hospital; they talked about retaliation . . . . Notwithstanding that there was a gun, she saw that gun, she called the house to lure *those people* out . . . ." (Emphasis added.)

We first address the defendant's claim that, in light of the long form information, the state is barred from claiming on appeal that the evidence was sufficient to

sustain a conviction on counts one and two because it adequately demonstrated that the defendant had the requisite intent that she or a coparticipant assaulted J.L.[8]

In her brief, the defendant correctly points out that, generally speaking, "the state is limited to proving that the defendant has committed the offense in substantially the manner described in the information." (Internal quotation marks omitted.) *State* v. *Martin*, 56 Conn. App. 98, 108, 741 A.2d 337 (1999), cert. denied, 252 Conn. 926, 746 A.2d 790 (2000). It is also true, however, that "[w]hen determining the scope of charges contained in an information, we construe the information liberally in favor of the state." *State* v. *DeJesus*, 92 Conn. App. 92, 103, 883 A.2d 813 (2005), appeal dismissed, 282 Conn. 783, 928 A.2d 533 (2007). Furthermore, we do not examine individual counts in isolation, but rather the entire structure of an information because it "is relevant to determining the charges and theories of liability for which a defendant had notice." Id., 104; see also *State* v. *Davis*, 154 Conn. App. 216, 228, 107 A.3d 962 (2014) ("[w]e do not read each count specified in the substitute information and bill of particulars in isolation" [internal quotation marks omitted]), cert. denied, 315 Conn. 918, 107 A.3d 961 (2015).

In this case, the long form information did not name, in counts one or two, a specific victim, and the defendant did not raise an objection with the court that the long form information was a legally inadequate response to her motion for a bill of particulars. See *State* v. *Vincent*, 194 Conn. 198, 205, 479 A.2d 237 (1984) (burden rests on defendant to request bill of particulars and statement of essential facts). Furthermore, the first count of the information provided the defendant with sufficient information about the state's allegations and theory of the crime; i.e., that Ayala called J.L. to confirm that both Rodriguez and J.L. were home, and that the defendant tried to lure both Rodriguez and J.L. to come out of the house while she, Knowles and Casiano were waiting outside. Thus, construing the information liberally and taking into account the state's arguments during trial, we conclude that the state intended to and in fact did argue that both J.L. and Rodriguez were the intended victims of the crime.

We next reject the defendant's assertion that the evidence at trial established that she agreed to assault J.L. only and did not have the intent that she or another participant cause serious physical injury to Rodriguez. Simply put, this argument does not withstand scrutiny under the weight of the evidence presented at trial.

The jury heard testimony that Knowles planned revenge on Rodriguez for inflicting an injury on him during the fight on the night before the shooting and at J.L. for threatening his then pregnant girlfriend. The jury also heard testimony that the defendant knew

about the plan and agreed to participate in it by guiding two men, one of whom had a gun on his lap, to J.L.'s residence, and then personally called J.L. and asked for her *and* Rodriguez to step out of their house. "[I]t is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Pommer*, 110 Conn. App. 608, 619, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008). On the basis of the evidence at trial, the jury reasonably could have found that the defendant's actions established that she intended for J.L. and Rodriguez to suffer serious physical injury.

Finally, we reject the defendant's argument, with respect to counts one and two, that there was insufficient evidence to demonstrate beyond a reasonable doubt that Knowles and Casiano shared her intent to assault J.L.[9] On the basis of the evidence presented at trial, the jury reasonably could have found that Knowles intended for both Rodriguez and J.L. to be injured when he solicited the defendant's help to assault J.L., and indiscriminately fired his gun at J.L.'s residence, knowing that both Rodriguez and J.L. were inside at that time. Accordingly, we conclude that there was sufficient evidence to sustain the defendant's conviction of conspiracy to commit assault in the first degree and of being an accessory to an attempt to commit assault in the first degree.

C

The defendant next claims that there was insufficient evidence to sustain her conviction of risk of injury to a child in violation of § 53-21 (a) (1). Specifically, the defendant argues that the state failed to present sufficient evidence to prove beyond a reasonable doubt that she wilfully had caused A.S. "to be placed in a situation where his life or limbs were endangered because: (1) there was no evidence that [the] defendant knew [A.S.] was inside the home; and (2) there was no evidence that she knew Knowles would use the gun." We disagree.

Section 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony . . . ."

"Although it is clear that [t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of [others] . . . we long have recognized that subdivision (1) of § 53-21 prohibits two different types of

behavior: (1) deliberate indifference to, acquiescence in, or the creation of *situations* inimical to the [child's] moral or physical welfare . . . and (2) *acts* directly perpetrated on the person of the [child] and injurious to his [or her] moral or physical well-being. . . . Cases construing § 53-21 have emphasized this clear separation between the two parts of the statute . . . ." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Robert H.*, 273 Conn. 56, 65, 866 A.2d 1255 (2005).

In this case, the defendant was charged under the "situation" prong of the statute. Pursuant to "the 'situation' portion of § 53-21 [a] (1), the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals."[10] *State* v. *Padua*, 273 Conn. 138, 148, 869 A.2d 192 (2005).

Last, "[c]onduct is willful when done purposefully and with knowledge of [its] likely consequences . . . . Specific intent is not a necessary requirement of [§ 53-21]. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, 131 Conn. App. 65, 76, 27 A.3d 374 (2011), aff'd, 308 Conn. 835, 68 A.3d 83 (2013). Again, "the charge of risk of injury to a child does not require proof of an actual injury, but only that the actions of the defendant exposed the victim to a situation that potentially could impair his health." *State* v. *Peters*, 40 Conn. App. 805, 828–29, 673 A.2d 1158, cert. denied, 237 Conn. 925, 677 A.2d 949 (1996).

As to the defendant's argument that it was necessary for the state to prove that she knew A.S. was inside the home at the time of the shooting, this court rejected a similar claim by a defendant in *State* v. *Davila*, 75 Conn. App. 432, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). In *Davila*, the defendant was charged with violating § 53-21 as a result of having fired several gunshots into an apartment occupied by five children and one adult. Id., 435. On appeal, the defendant claimed, inter alia, that there was insufficient evidence to support his conviction of risk of injury to a child because "he was unaware of the presence of [children] in the apartment when the gunshots were fired." Id., 438. In rejecting the defendant's claim, this court held that "[r]egardless of whether the defendant knew that the children were in the apartment, the jury reasonably could have found that he violated [§ 53-21] on the basis of his reckless disregard of the consequences of his actions." Id.; see also *State* v. *Reid*, 85 Conn. App. 802, 808–10, 858 A.2d 892 (rejecting defendant's claim on appeal that "there was no credible evidence that he had the intent necessary to be convicted

under § 53-21 because he was unaware that the child was in [the] victim's house when he entered it"), cert. denied, 272 Conn. 908, 863 A.2d 702 (2004); *State* v. *Carter*, 84 Conn. App. 263, 275, 853 A.2d 565 (to be properly convicted under § 53-21, "[i]t is not necessary that the court instruct the jury that there must be evidence that the defendant intended to harm the victim or knew that she was in the area and would likely be injured by a stray bullet"), cert. denied, 271 Conn. 932, 859 A.2d 931 (2004), cert. denied, 544 U.S. 1066, 125 S. Ct. 2529, 161 L. Ed. 2d 1120 (2005).

As we determined in parts I A and B of this opinion, there was sufficient evidence before the jury to find that the defendant conspired and attempted to commit an assault in the first degree. This evidence was also sufficient for the jury reasonably to find that the defendant's conduct constituted a reckless disregard of the consequences of her actions. The defendant conspired with Knowles and Casiano to go to J.L.'s house to obtain revenge for the beating of Knowles. They needed her to direct them to J.L.'s residence, and she did that although she knew that Knowles had a gun in his possession. Despite her knowledge of Knowles' possession of a gun and anger about being beaten by Rodriguez, she attempted to convince Rodriguez and J.L. to come out of J.L.'s residence. After her efforts failed, Knowles exited the vehicle and shot two bullets into J.L.'s residence. These facts were sufficient for the jury to find that the defendant wilfully permitted a child under the age of sixteen years to be placed in such a situation that the life or limb of such child was endangered.

Furthermore, even if the state were required to establish that the defendant knew that A.S. was likely to be at the house at the time of the shooting, it presented sufficient evidence to satisfy that burden. J.L. testified that the defendant had been her "good friend" prior to the shooting, and that the defendant had visited her apartment on a daily basis when they lived in the same apartment complex. J.L. further also testified that, as a result of their friendship, the defendant would have known that A.S. resided only with J.L. because she had sole custody of the child and "there really wasn't any other place he would be." On the basis of this testimony, the jury reasonably could have inferred that the defendant knew that A.S. was likely to be at J.L.'s residence at the time of the shooting. See *State* v. *Smalls*, 78 Conn. App. 535, 548, 827 A.2d 784 ("defendant's conduct took place in public where children were likely to be present"), cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

Accordingly, viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to convict the defendant of risk of injury to a child.

II

## INSTRUCTIONAL ERROR

The defendant next claims that the "court's [jury] instructions on conspiracy and attempted assault were misleading." Specifically, the defendant claims that under "the unique circumstances of this case, where the state failed to specify a particular victim in the information but its theory of the case suggested that Rodriguez was the intended target, the court was obligated to instruct the jurors that they had to agree that Rodriguez was the person whom [the] defendant and her cohorts intended to assault and agreed to assault." Alternatively, the defendant claims that the court's instructions allowed the jury to find her guilty without being unanimous as to the intended victim. We are not persuaded.

The defendant concedes, in her brief, that she failed to preserve this claim at trial. Therefore, she now seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1988).[11] We review the defendant's claim because the record is adequate, and the issue is of constitutional magnitude. See *State* v. *Belton*, 190 Conn. 496, 500–505, 461 A.2d 973 (1983).

The following facts are relevant to this claim. After the parties had rested, the court instructed the jury on the elements of conspiracy to commit assault in the first degree and attempt to commit assault in the first degree as an accessory. The court in its instructions did not name the intended victim of the crime. Regarding the jury's obligation to reach a unanimous verdict, the court instructed the jurors that it was their "duty to consider each charge or count separately and when you return to the courtroom, you will be asked whether the accused is guilty or not guilty as charged in each of the counts. You will render your verdicts accordingly; your verdicts *must be unanimous* on each count." (Emphasis added.) Thereafter, the court further charged the jury that its "verdicts must be *unanimous, that is, one with which you all agree.*" (Emphasis added.) In addition, once the jury had reached its verdict, it was polled by the court to verify the unanimity of the verdict.

### A

The defendant concedes that the court's instructions on conspiracy and attempt were "technically correct . . . ." Nevertheless, she argues that the court's failure to instruct the jury that it was limited to determining whether Rodriguez had been the intended victim of the conspiracy and the attempted assault allowed the jury to find her guilty "of crimes with which she was never charged—conspiracy to assault [J.L.] and attempt to assault [J.L.] as an accessory." We disagree.

As we concluded in part I B of this opinion, the state's theory of the case was that the defendant had conspired and attempted to assault both Rodriguez and J.L. Thus,

the court's instructions were consistent with the charges and did not "effectively [enlarge] the information . . . ." Accordingly, the defendant's argument fails.

B

The defendant next argues that the court's "instructions permitted the jury to convict [the] defendant of conspiracy and attempt without unanimously agreeing on which person was the intended target." We disagree.

"Regarding a court's instruction to a jury prior to its deliberations, we have not required a specific unanimity charge to be given in every case . . . . In *State* v. *Famiglietti*, 219 Conn. 605, 619–20, 595 A.2d 306 (1991), we set forth a multipartite test to determine whether a trial court's omission of a specific unanimity charge warrants a new trial. We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged."[12] (Citation omitted; internal quotation marks omitted.) *State* v. *Jessie L. C.*, 148 Conn. App. 216, 232, 84 A.3d 936, cert. denied, 311 Conn. 937, 88 A.3d 551 (2014).

"With respect to the first prong of *Famiglietti*, namely, whether the trial court's jury instructions have sanctioned a nonunanimous verdict, it is well established that the absence of language *expressly sanctioning* a nonunanimous verdict means that the defendant has not met the first part of the *Famiglietti* test. . . . Indeed, if the trial court did not sanction a nonunanimous verdict we need not address the other parts of the *Famiglietti* test." (Emphasis in original; internal quotation marks omitted.) *State* v. *Brodia*, 129 Conn. App. 391, 403, 20 A.3d 726, cert. denied, 302 Conn. 913, 27 A.3d 373 (2011). Our review of the jury charge does not reveal that the court used any language expressly sanctioning a nonunanimous verdict. On the contrary, the trial court clearly instructed the jury on its duty to reach a unanimous verdict as to each count and later ensured that it in fact had done so by polling the jury. Therefore, the defendant's argument must fail.

As a result, we conclude that neither of the defendant's claims of instructional error satisfy the third prong of the *Golding* test, namely, that an alleged constitutional violation exists. Accordingly, she cannot prevail on these claims.[13]

III

SECTION 53-202k SENTENCE ENHANCEMENT

The defendant's final claim is that the court improperly enhanced her sentence on the conviction of conspiracy to commit assault in the first degree and risk of injury to a child pursuant to § 53-202k.[14] Specifically, she claims that the sentence enhancement on her conviction of conspiracy to commit assault in the first degree was improper because in *State* v. *Patterson*, 276 Conn. 452, 476–84, 886 A.2d 777 (2005), our Supreme Court held that § 53-202k does not apply to unarmed coconspirators. The defendant also claims that the sentence enhancement on her conviction of risk of injury to a child was improper because she was charged with this crime only as a principal and the state presented no evidence that she was armed with a gun. We agree with the defendant that the court improperly enhanced the sentences on these two counts. We further note that the defendant has not challenged on appeal her sentence enhancement on her conviction of attempt to commit assault in the first degree.

The following facts are relevant to this claim. On August 7, 2012, the state, pursuant to § 53-202k, filed a notice that it would seek an enhanced sentence if the defendant was convicted of a class A, B or C felony in which the defendant or a participant used a firearm. Thereafter, the jury, having found the defendant guilty of conspiracy to commit assault in the first degree, attempt to commit assault in the first degree as an accessory, and risk of injury to a child, considered three separate interrogatories, which posed the identical question: "Has the state proven to all of you unanimously beyond a reasonable doubt, that the defendant or another participant used, or was armed with and threatened the use of, or displayed a firearm?" The jury answered that the state had done so. The court then applied a five year enhancement to the sentences on each of the three charges of which the defendant had been found guilty.

A

The defendant first claims that the court improperly enhanced her sentence for her conviction of conspiracy to commit assault in the first degree because § 53-202k does not apply to unarmed coconspirators. We agree.

The defendant concedes that her claim was not preserved at trial and she now seeks to prevail under *Golding*. Once again, we review the defendant's claim because the record is adequate, and the issue is of constitutional magnitude.[15]

The question of whether § 53-202k applies to unarmed coconspirators has been previously addressed by our Supreme Court in *State* v. *Patterson*, supra, 276 Conn. 473–84. "In *Patterson*, the defendant had claimed that the trial court improperly concluded that he was subject to a mandatory five year sentence enhancement pursuant to General Statutes § 53-202k because the jury

had failed to make the requisite finding under that statute that he had 'used' a firearm during the commission of the crime of conspiracy to commit murder. . . . The state had conceded that the jury made no such finding but had argued that the facts that the jury actually found, namely, that one of the defendant's coconspirators had used a firearm during the commission of the offense, were sufficient to warrant the imposition of a sentence enhancement under § 53-202k. . . . Because [the] court previously had determined that an unarmed accomplice to a class A, B or C felony may be found to have violated § 53-202k on the basis of his or her accomplice's use of a firearm, the state had argued that this principle should be extended to coconspirators under the *Pinkerton* doctrine[16] . . . . In rejecting that argument, [the] court principally relied on the fact that, at the time § 53-202k was enacted in 1993; see Public Acts 1993, No. 93-306, § 9; the *Pinkerton* doctrine of vicarious liability was not well established in our state criminal law. Indeed, this court did not expressly adopt the *Pinkerton* doctrine for purposes of our state criminal law until 1993 . . . the very year that § 53-202k was enacted. Thus, unlike accessorial liability, which, as a common-law and statutory rule, was firmly rooted in this state's criminal jurisprudence prior to the enactment of § 53-202k, *Pinkerton* liability was not an acknowledged part of that body of law when § 53-202k was enacted. Consequently, [the court held that] there [was] no reason to presume that the legislature contemplated that the *Pinkerton* principle of vicarious liability would apply to § 53-202k." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Apodaca*, 303 Conn. 378, 395–96, 33 A.3d 224 (2012).

Nevertheless, on appeal, the state argues that "*Patterson*'s narrow decision does not control the question presented here." Specifically, the state argues that our Supreme Court in *Patterson*, as a matter of statutory interpretation, rejected only the specific claim made by the state in that case that a § 53-202k sentence enhancement applies to an unarmed coconspirator if the state has charged the defendant with conspiracy pursuant to the *Pinkerton* doctrine. The state contends, however, that a § 53-202k sentence enhancement remains available in circumstances where an unarmed coconspirator is charged under "Connecticut's long-standing common-law theory of vicarious coconspirator liability, which existed for decades prior to our court's adoption of *Pinkerton*." We are not persuaded by the state's argument for at least two reasons.

First, the Supreme Court's holding in *Patterson* that § 53-202k does not apply to an unarmed coconspirator did not rest solely on the ground that *Pinkerton* vicarious liability had not been judicially recognized in Connecticut before the enactment of § 53-202k. In addition to that ground, the Supreme Court also relied on the more fundamental difference between accessorial lia-

bility and conspirator liability: "[A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. . . . By contrast, under the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did not commit if the state can establish that a coconspirator did commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy. . . . In view of the important difference between accessory liability and *Pinkerton* liability, we reject the state's contention that we should treat them similarly for the purpose of determining whether the legislature intended to incorporate the latter into § 53-202k." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson,* supra, 276 Conn. 483. We can divine no reason why this reasoning should not apply to any form of vicarious coconspirator liability, even if that form of conspiracy liability, as the state contends, is somehow different from *Pinkerton* liability.

Second, we reject the state's premise that the *Pinkerton* form of vicarious coconspirator liability recognized in *State* v. *Walton,* 227 Conn. 32, 40–54, 630 A.2d 990 (1993), is somehow different from the common-law form of vicarious, coconspirator liability the state contends was firmly rooted in Connecticut for generations before *Walton.* We base our conclusion on our review of the pre-*Walton* case law cited by the state in support of its argument on appeal. As the state correctly notes in its brief, the universally accepted rule at that time was: "All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design."[17] (Internal quotation marks omitted.) *State* v. *Cots,* 126 Conn. 48, 59, 9 A.2d 138 (1939); see also *State* v. *Spalding,* 19 Day (Conn.) 233, 237 (1848) ("the law presumes, that what was known by one, or done by one, in matters connected with the joint purpose, was known and done by both"). As noted previously, the *Pinkerton* doctrine stands for the proposition that a conspirator may be held "vicariously liable for the criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." (Internal quotation marks omitted.) *State* v. *Santiago,* 275 Conn. 192, 198, 881 A.2d 222 (2005).

A simple comparison of the principles expressed in the pre-*Walton* form of conspiracy to the *Pinkerton*

doctrine makes it abundantly clear, however, that the common-law theory of vicarious coconspirator liability identified by the state is nothing more than an early species of *Pinkerton* without that label. Thus, if we were to accept the state's argument, the state would be able to avoid *Patterson*'s holding by claiming that it was not seeking to hold a defendant liable under the *Pinkerton* doctrine, but rather, under the common-law theory of vicarious coconspirator liability that is essentially coterminous with *Pinkerton*. Such an outcome would effectively render our Supreme Court's decision in *Patterson* a virtual nullity—something this court should obviously strive to avoid. Therefore, we reject the state's argument that *Patterson* does not apply to this case.

Because we conclude that a § 53-202k enhancement does not apply to an unarmed coconspirator, and there was no evidence that the defendant was armed at the time of the shooting, the defendant has demonstrated that a constitutional violation exists and that this violation deprived her of a fair trial. Accordingly, the defendant is entitled to have the sentence enhancement under § 53-202k on count one vacated.

### B

The defendant next claims that the court improperly enhanced her sentence on the conviction of risk of injury to a child.[18] Specifically, she claims that a § 53-202k sentence enhancement could not lawfully be applied to her conviction of the crime of risk of injury to a child because she was convicted, not as an accessory, but as a principal, and there was no evidence that she personally had used a firearm in the commission of the offense. We agree with the defendant.

As noted previously, the defendant was charged under the "situation" prong of § 53-21 (1), which requires the state to prove that the defendant wilfully created a situation that posed a risk to the child's health or morals.[19] In its brief on appeal, the state essentially concedes that the defendant's conviction on this count was only as a principal: "[I]n the creation of the situation, the defendant was a principal, insofar as she led her cohorts in the drive-by shooting to J.L.'s address and then attempted to lure J.L. and Rodriguez outside so that Knowles could fire on them." Moreover, the court did not instruct the jury that the defendant could be found guilty on the risk of injury charge on the basis of accessorial liability, nor did the state request such an instruction.[20] Finally, the state instead argued to the jury that the defendant, by her own actions, had created a situation "in which harm was likely to befall the life or limb of the child." The state did not argue to the jury that she could be found guilty of risk of injury to a child as an accessory.

In its brief, however, the state argues that it is irrele-

vant that it did not charge the defendant with risk of injury to a child as an accessory because "[i]t is well established in this state that there is no such crime as being an accessory. . . . Rather, the accessory statute, General Statutes § 53a-8, merely provides an alternative theory under which liability for the underlying substantive crime may be proved. . . . [A] defendant may be convicted as an accessory even though he was charged only as a principal as long as the evidence presented at trial is sufficient to establish accessorial conduct. . . . Therefore, the fact that the defendant was not formally charged as an accessory does not preclude his being convicted as such . . . and a defendant who is charged with an offense should be on notice that he may be convicted as an accessory." (Citations omitted; internal quotation marks omitted.) *State* v. *Hopkins*, 25 Conn. App. 565, 568–69, 595 A.2d 911, cert. denied, 220 Conn. 921, 597 A.2d 342 (1991).

Although we agree with the state's recitation of these principles, in order to be convicted as an accessory it is at least necessary for the court to have instructed the jury on principles of accessorial liability. See *State* v. *Channer*, 28 Conn. App. 161, 166, 612 A.2d 95 (noting in review of sufficiency of evidence that reviewing court is limited to considering whether evidence supported finding that defendant acted as principal because trial court did not instruct jury as to accessorial liability), cert. denied, 223 Conn. 921, 614 A.2d 826 (1992). Accordingly, we reject the state's claim that the defendant was convicted as an accessory in this case.

The state also argues that, even if the defendant was convicted of risk of injury to a child only as a principal and that there was no evidence that she personally used a firearm, the enhancement was still proper because the state "charged the *enhancement* under a theory of accessorial liability" in its notice of its intent to pursue § 53-202k enhancement when it "alleged that the defendant *or a participant*" used a firearm during the commission of the offense. (Emphasis added.)

We conclude for the following reasons that, under the unusual circumstances of this case, where it is clear that the defendant was convicted of risk of injury to a child only as a principal, a sentence enhancement pursuant to § 53-202k is not appropriate without sufficient evidence that the defendant herself had used a firearm during the commission of the underlying offense.

It is beyond dispute that § 53-202k is *not* a substantive offense but rather a sentence enhancement provision. *State* v. *Dash*, 242 Conn. 143, 148, 698 A.2d 297 (1997). Section 53a-8, which imposes accessorial liability for the acts of another, applies by its terms only to "conduct which constitutes an offense . . . ."[21] There is no language in § 53a-8 from which we could conclude that the legislature intended that the provision apply to a

sentence enhancement statute. Finally, the state cites to no authority in which a court has relied upon accessorial liability to enhance the sentence of an unarmed defendant who was convicted only as a principal. For these reasons, the defendant could not have her sentence enhanced pursuant to § 53-202k as an accessory because § 53-202k is not an offense.

Accordingly, we conclude that, under the circumstances of this case, the sentence enhancement provision did not apply to the defendant's conviction under count three, risk of injury to a child. Additionally, the evidence at trial was not sufficient to establish beyond a reasonable doubt that the defendant had used a firearm during the commission of a class A, B or C felony as required by § 53-202k. As a result, the defendant is entitled to have her sentence enhancement under § 53-202k vacated.

The judgment is reversed only as to the sentence enhancement under § 53-202k of the sentences on the conviction of conspiracy to commit assault in the first degree and risk of injury to a child, and the case is remanded with direction to vacate those enhancements.[22] The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] Ayala was unable to fight because, at that time, she was pregnant with Knowles' child.

[3] J.L.'s friend, Casey Delmonte was also present.

[4] At trial, J.L. testified that, shortly before the shooting, she had moved to a new residence, and that the only person to whom she had disclosed her new address was the defendant.

[5] We note that at that time, Knowles had an outstanding warrant for his arrest in New York.

[6] The defendant does not challenge on appeal the manner in which the court calculated or structured her sentence.

[7] We note that although the state amended the long form information during trial, the factual allegations in counts one and two remained unchanged.

[8] Although the defendant concedes that there was evidence before the jury that she intended to assault J.L., she does not concede that the evidence was sufficient to prove beyond a reasonable doubt that she intended to cause serious physical injury to J.L. See part I A of this opinion.

[9] In her brief, the defendant appears to argue that, without a shared intent that J.L. be assaulted, the defendant could not have conspired with Knowles and Casiano, a necessary predicate for a conviction on count one, and could not have importuned or intentionally aided Knowles or Casiano to assault J.L., a necessary predicate for a conviction on count two.

[10] The "act" prong requires proof that the defendant directly perpetrated an act injurious to the child's moral or physical well-being on the actual person of the child. See, e.g., *State* v. *Padua*, 273 Conn. 138, 148, 869 A.2d 192 (2005).

[11] In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.); see *In re Yasiel R.*, 317 Conn. 773, 781, A.3d (2015) (modifying *Golding*'s third prong).

[12] In her brief, the defendant argues that the *Famiglietti* test is not applicable in this case because it "only applies when a defendant is charged with committing a crime by violating several alternative subsections of a statute, or in other words, by committing a crime in several different ways." In response, the state argues that the *Famiglietti* test has been used by both this court and our Supreme Court in cases claiming that "a trial court's instructions permitted a jury to reach a nonunanimous verdict as to the facts supporting a charge."

We agree with the state's argument and conclude that, although the application of the *Famiglietti* test generally arises in cases involving a claim that criminal liability has been premised on the violation of one of several alternative subsections of a statute, it is not the exclusive circumstance under which the test has been utilized by our appellate courts. See *State* v. *Sorabella*, 277 Conn. 155, 206–208, 891 A.2d 897 (applying *Famiglietti* test where trial court's instructions did not expressly require jury to unanimously find that particular image or group of images was obscene), cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006); *State* v. *Graham S.*, 149 Conn. App. 334, 348–50, 87 A.3d 1182 (applying *Famiglietti* test where trial court's instructions did not expressly require unanimity as to factual basis that constituted first degree burglary, second degree strangulation, and risk of injury to child), cert. denied, 312 Conn. 912, 93 A.3d 595 (2014); *State* v. *Jessie L. C.*, 148 Conn. App. 216, 232–33, 84 A.3d 936 (applying *Famiglietti* test where trial court did not instruct jury that verdict must be unanimous as to facts underlying each count), cert. denied, 311 Conn. 937, 88 A.3d 551 (2014); *State* v. *Brodia*, 129 Conn. App. 391, 401–404, 20 A.3d 726 (applying *Famiglietti* test where trial court's instructions did not expressly require unanimity as to whether defendant had actual or constructive possession of drugs), cert. denied, 302 Conn. 913, 27 A.3d 373 (2011); *State* v. *Senquiz*, 68 Conn. App. 571, 587–90, 793 A.2d 1095 (applying *Famiglietti* test where trial court's instructions did not expressly require unanimity as to which specific acts, out of several, established defendant's guilt), cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

[13] The defendant also seeks reversal of her conviction pursuant to the plain error doctrine. See Practice Book § 60-5. Because we conclude, however, that there was no instructional error, this case does not present "one of the truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings" to warrant a reversal pursuant to the plain error doctrine. (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

[14] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years . . . in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[15] We conclude that this claim is of constitutional magnitude because if the defendant is correct that § 53-202k does not apply to an unarmed coconspirator, then the jury would have been obligated to find that the defendant possessed a firearm in the commission of a class A, B or C felony—a finding it could not make on this record. See *State* v. *Patterson*, supra, 276 Conn. 484; see also *State* v. *Hill*, 201 Conn. 505, 512, 523 A.2d 1252 (1986) ("[a]n accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt").

[16] "In *Pinkerton* v. *United States*, [328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)], the United States Supreme Court concluded that under the federal common law, a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *State* v. *Diaz*, 237 Conn. 518, 526, 679 A.2d 902 (1996).

We note that our Supreme Court first recognized the *Pinkerton* theory of liability as a matter of state law in *State* v. *Walton*, 227 Conn. 32, 40–54, 630 A.2d 990 (1993).

[17] The state also correctly points out that "[a]lthough courts most frequently applied this principle of vicarious coconspirator liability to murders committed in furtherance of conspiracies to commit other crimes, its use

was not [explicitly] limited to murder prosecutions." See also *State* v. *Walton*, supra, 227 Conn. 50–51.

[18] We note that the defendant at trial preserved this issue for appellate review.

[19] Count three of the amended long form information alleged "that the said [defendant] did unlawfully cause a child under the age of sixteen years; to wit: to be placed in such situation that the life or limb of such child was endangered, in the town or city of Torrington, on or about January 10, 2009, in violation of Connecticut General Statutes § 53-21 (a) (1)."

[20] The court instructed the jury on accessorial liability only with respect to the charge of attempt to commit assault in the first degree. Moreover, the court, before instructing the jury on the specific charges in the information, did not give a general instruction on accessorial liability that arguably could apply to all of the counts. Thus, this case is unlike *State* v. *Holley*, 160 Conn. App. 578,    A.3d    (2015). Additionally, the risk of injury statute, unlike, for example, robbery in the first degree, General Statutes § 53a-134, does not include explicit language imposing accessorial liability. See *State* v. *Davis*, 255 Conn. 782, 791 n.8, 772 A.2d 559 (2001).

[21] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[22] During oral argument, we raised the issue of resentencing with the parties. The state argued that, if any of the defendant's sentence enhancements are vacated, the case should be remanded to the trial court for resentencing pursuant to the aggregate package theory articulated by this court in *State* v. *Raucci*, 21 Conn. App. 557, 563–64, 575 A.2d 234, cert. denied, 215 Conn, 817, 576 A.2d 546 (1990). The defendant opposed the state's position, arguing that, if any of the enhancements are vacated, the enhancement on that count should simply be vacated.

As our Supreme Court stated recently, "[the] principles of judicial economy dictate that, in a case in which the judgment of the reviewing court does not change the total effective sentence, the reviewing court should not order the trial court to resentence a defendant on the remaining convictions unless there is some evidence or some other basis in the record supporting the conclusion that the judgment of the reviewing court altered the original sentencing intent." *State* v. *Johnson*, 316 Conn. 34, 42–43, 111 A.3d 447 (2015).

Because our decision does not alter the total effective sentence, and because there is no evidence that our decision would alter the trial court's original intent at sentencing, we disagree with the state's argument and conclude that the defendant need not be resentenced. See *State* v. *Patterson*, supra, 276 Conn. 491.